# THE PIPE LINE CASES.[1]

## APPEALS FROM THE UNITED STATES COMMERCE COURT.

Nos. 481, 482, 483, 506, 507, 508. Argued October 15, 16, 1913.—Decided June 22, 1914.

The provision in the Hepburn Act, amending the Act to Regulate Commerce by making persons or corporations engaged in transporting oil from one State to another by pipe lines carriers within the provisions of the act, applies to the combination of pipe lines owned and controlled by the Standard Oil Company and to the constituent corporations united in a single line, although the only oil transported is that which has been purchased by the Standard Oil Company or by such constituent corporations prior to the transportation thereof.

As applied to existing corporations, the pipe line provision of the Hepburn Act does not compel persons engaged in interstate transportation of oil to continue in operation, but it does require them not to continue to transport oil for others or purchased by themselves except as common carriers.

The fact that the article transported between interstate points has been purchased by the carrier, is not conclusive against the transportation being interstate commerce; and in this case, *held* that interstate transportation of oil purchased from the producers by the owner of the pipe is interstate commerce and under the control of Congress.

While the control of Congress over commerce among the States cannot be made a means of exercising powers not committed to it by the Constitution, it may require those who are common carriers in substance to become so in form.

The provision in the Hepburn Act requiring persons or corporations engaged in interstate transportation of oil by pipe lines to become common carriers and subject to the provisions of the Act to Regulate Commerce is not unconstitutional, either as to future pipe lines or as to the owners of existing pipe lines, as depriving them of their property without due process of law.

---

[1] Docket title of these cases: No. 481. United States *v.* Ohio Oil Company. No. 482. United States *v.* Standard Oil Company. No. 483. United States *v.* Standard Oil Company of Louisiana. No. 506. United States *v.* Prairie Oil & Gas Company. No. 507. United States *v.* Uncle Sam Oil Company. No. 508. United States *v.* Benson, doing business under the Partnership Name of Tide Water Pipe Company, Limited.

Requiring a person engaged in interstate transportation of oil by pipe lines to become a common carrier does not involve a taking of private property, and the provision in the Hepburn Act to that effect is not unconstitutional under the Fifth Amendment.

A corporation engaged in refining oil may draw oil from its own wells through a pipe line across a state line to its own refinery for its own use without being a common carrier under the pipe line provisions of the Hepburn Act, the transportation being merely incidental to the use of the oil at the end.

204 Fed. Rep. 798, reversed in part and affirmed in part.

THE facts, which involve the constitutionality, construction and application of the provisions in the Hepburn Act relating to interstate transportation of oil by pipe lines, are stated in the opinion.

*The Solicitor General* for the United States and *Mr. Charles W. Needham* for the Interstate Commerce Commission:

The pipe line amendment applies to these petitioners. Congress intended the act to apply to every interstate oil-carrying pipe line, and to compel every such interstate pipe line to become a common carrier as a condition precedent to engaging in interstate commerce. Whether any particular pipe line had or had not been a common carrier prior to the passage of the act is wholly immaterial.

The debates in Congress may be consulted to ascertain the evils at which the act was aimed, its legislative history, the amendments that were offered and rejected during its passage and the general history of the times. *Am. Net. Co.* v. *Worthington*, 141 U. S. 468, 473; *Binns* v. *United States*, 194 U. S. 486, 495, 496; *Blake* v. *National Bank*, 23 Wall. 307, 319; *Holy Trinity Church* v. *United States*, 143 U. S. 457, 465; *Jennison* v. *Kirk*, 98 U. S. 453.

Here the debates show that the evil aimed at was the monopolization of the oil business by owners of private pipe lines. Amendments restricting the application of the act to pipe lines engaged in transportation "for hire" or

"for the public" were repeatedly rejected. 40 Cong. Rec. 6361, 6365, 6999–7009, 9254–9256.

The rule of construction followed in the *Commodities Case*, 213 U. S. 366, is not applicable here. That rule applies only when the statute is ambiguous. *Employers' Liability Cases*, 207 U. S. 463, 500.

The act is constitutional. It stands the test laid down in *Minnesota* v. *Barber*, 136 U. S. 313, 320; *C., B. & Q. Ry.* v. *Drainage Commissioners*, 200 U. S. 561, 592; *McCulloch* v. *Maryland*, 4 Wheat. 421, namely, that:

The object of the act is one for which the Federal authority may properly be exercised.

The means employed have in fact a real and substantial relation to the object sought. They are reasonable and not arbitrary or beyond the necessities of the case.

The object of the pipe line amendment, to regulate interstate commerce in oil by protecting well owners and independent refiners from duress by pipe line owners is one for which the authority of Congress may properly be exercised. *Standard Oil Co.* v. *United States*, 221 U. S. 1; *Waters-Pierce Oil Co.* v. *Texas*, 212 U. S. 86, 109; *Central Lumber Co.* v. *South Dakota*, 226 U. S. 157; *Continental Paper Co.* v. *Voight*, 212 U. S. 227, 271.

The private operation of pipe lines carrying oil in interstate commerce tends to monopoly. *Standard Oil Case*, 221 U. S. 1, 12, 42, 80–81; *Tex. & Pac. Ry. Co.* v. *Int. Com. Comm.*, 162 U. S. 197, 210; *Report on the Petroleum Transportation*, 59 Cong., 1st Sess., House Doc. 812, pp. 29, 37, 62; *Report of Int. Com. Comm.*, 59 Cong., 2d Sess., House Doc. 606, pp. 2, 5, 6, 14.

No other means of transportation can possibly compete with pipe lines. If a well owner cannot ship by pipe line he cannot (practically) ship at all. Without a pipe line the small producer is as truly shut in as was the mine owner in *Strickley* v. *Highland Boy Mining Co.*, 200 U. S. 597, or the arid land owner in *Clark* v. *Nash*, 198 U. S. 361. *Ohio.*

*Oil Co.* v. *Indiana,* 177 U. S. 190. The statute is designed to prevent an unconscionable use of economic advantages.

The operation of pipe lines as common carriers is beyond question commercially practicable, as is shown by prior Federal legislation; prior Federal decisions; state legislation; state decisions; public records and reports; current sources of information, encyclopædias, etc.

The Fifth Amendment does not prohibit the adoption by Congress of this means, so found to be in fact reasonable and appropriate to the accomplishment of its purpose. Congress may prohibit a kind of commerce harmful to the public. *Hoke* v. *United States,* 227 U. S. 308; *The Lottery Cases,* 188 U. S. 358. This power may be exerted for purely economic purposes whenever the strong, preponderant public opinion believes that there is a great public need. *Noble State Bank* v. *Haskell,* 219 U. S. 104; *C., B. & Q. R. Co.* v. *Drainage Commissioners,* 200 U. S. 561, 592; *Standard Oil Case,* 221 U. S. 1.

In many instances regulations have taken the form of prohibition except upon such conditions as would protect the public welfare. *The Commodities Case,* 213 U. S. 366; *Atlantic Coast Line* v. *Riverside Mills,* 219 U. S. 186, 202, 203; *Norfolk & Western Ry. Co.* v. *Dixie Tobacco Co.,* 228 U. S. 593; *Southern Ry.* v. *Reid,* 222 U. S. 424, 438.

It is immaterial that in the present case the condition is not express but implied. The same was true of the banking act and the Carmack Amendment, 34 Stat. 584, 595; *Noble State Bank* v. *Haskell,* 219 U. S. 213; *Atlantic Coast Line Case,* 219 U. S. 186, 203; see also *Engel* v. *O'Malley,* 219 U. S. 128; *Mugler* v. *Kansas,* 123 U. S. 623.

The present statute is valid as a means of preventing owners of pipe lines from obtaining an inequitable proportion of the oil from the common reservoir. *Ohio Oil Co.* v. *Indiana,* 177 U. S. 190, 210; *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S. 61. Even at common law it would have been unlawful for a single proprietor to install

at great expense pumping machinery so powerful that he could rapidly draw away the entire common reservoir. *Forbell* v. *City of New York*, 164 N. Y. 522, 526. See also *Kansas* v. *Colorado*, 206 U. S. 46. Clearly the use of such pumps might be forbidden by statute. *Manufacturers Gas Co.* v. *Indiana Gas Co.*, 155 Indiana, 461; *Oklahoma* v. *Kansas Gas Co.*, 221 U. S. 229, 262. And if their use could be prohibited absolutely, why could it not also be prohibited except upon condition that their owner should give to the adjacent proprietors an equitable proportion of the common property.

Nor does the law violate the Fifth Amendment in that, being general in its terms, it might cover pipe lines which are not public markets for oil. Whether purely private pipe lines must be entirely prohibited in order to give the public adequate protection is a matter of legislative discretion. *Purity Extract Co.* v. *Lynch*, 226 U. S. 192; *Booth* v. *Illinois*, 184 U. S. 425; *Lemieux* v. *Young*, 211 U. S. 489; *Powell* v. *Pennsylvania*, 127 U. S. 678, 685; *Silz* v. *Hesterberg*, 211 U. S. 31; *Commonwealth* v. *Gilbert*, 160 Massachusetts, 157; *Knoxville Iron Co.* v. *Harbison*, 183 U. S. 13; *The Slaughter-house Cases*, 16 Wall. 36; The Pure Food Law, 34 Stat. 768, 770.

Nor does the act take property for public use without compensation. This clearly is true as to the prohibition of purely private operation. The exclusive element is the monopoly element. No compensation need be given for that. There is no vested right in a noxious use of property. *Standard Oil Case*, 221 U. S. 1; *Mugler* v. *Kansas*, 123 U. S. 623, 669; *Commodities Case*, 213 U. S. 366, 405; *Noble State Bank* v. *Haskell*, 220 U. S. at 100; *Union Bridge Co.* v. *United States*, 204 U. S. 364; *Slaughter-house Cases*, 16 Wall. 36; *L. & N. R. Co.* v. *Mottley*, 219 U. S. 467; *C., B. & Q. R. Co.* v. *Drainage Commissioners*, 200 U. S. 561, 592.

The business of the appellees is *quasi*-public. The test to determine whether a business is *quasi*-public is by as-

certaining whether public grants and franchises are essential to establish and carry on the business; if the business cannot be carried on without such privileges it is *quasi-public*; such grants and franchises subject the business to a continuing public control; as is the case with all public utility companies requiring rights in public streets and reservations.

Public markets where agents of a business determine property rights for the public by inspecting, grading, weighing and measuring staple products regularly offered for sale at such markets, are charged with a public interest. *W. W. Cargill Co.* v. *Minnesota R. & W. Comm.*, 180 U. S. 452.

Pipe lines require, and are granted, franchises to cross and run along public highways, streets, rights of way of railroads, public lands and reservations. These privileges, or some of them, have been granted to each of the appellees. Each appellee is engaged in buying crude oil in the fields of production; they have their business headquarters where oil is bought from producers; the oil is inspected, graded and gauged for sale, by the agents of the appellees and other pipe lines.

In the *Ohio Oil Case* the transportation is sixty miles and across a state line. This is not a "plant facility." It is transportation from the field of production to a point of consumption. Ownership of the pipe line, or the oil, does not change the control of Congress over it. If the State of Kansas should require a license tax of all persons or corporations bringing oil into the State by means of pipe lines, it would be held to be invalid as a burden upon interstate commerce, regardless of ownership. If it can receive protection under the commerce clause, it is certainly liable to regulation under that provision of the Constitution. *Robbins* v. *Tax. Dist. of Shelby Co.*, 120 U. S. 489.

*Mr. John G. Milburn*, with whom *Mr. Frank L. Crawford, Mr. Walter F. Taylor, Mr. M. F. Elliott* and *Mr.*

*Chester O. Swain* were on the brief, for appellees in Nos. 481, 482, and 483:

The Interstate Commerce Act as amended in 1906 does not apply to the appellee, nor to any owner of a private pipe line.

The act was intended to relate to persons engaged in the business of transporting oil. Any other interpretation raises grave and doubtful constitutional questions.

Debates in Congress may not be referred to in aid of construction of a statute. *Omaha St. Ry.* v. *Int. Com. Comm.*, 230 U. S. 324.

As construed by the Government, the act makes common carriers of persons and corporations owning and operating private pipe lines used solely for the purpose of transporting the oil of the owners in the conduct of their private business, even though such owners have never held themselves out as common carriers, have never exercised or possessed and do not now possess any right of eminent domain, and derive no powers from state laws under which common carrier corporations are organized. It follows that the act deprives such persons and corporations of their property without due process of law, and takes it for public use without just compensation.

To make the owners of private pipe lines common carriers as to those lines is to subject private property to a public use and is a "taking" of property within the meaning of the Fifth Amendment.

Since the act, as thus construed, takes private property without providing for due compensation, it violates the Fifth Amendment.

The power of Congress to regulate interstate commerce, like all other powers delegated to that body, is subject to the limitations imposed by the Fifth Amendment.

The contention of the United States that just compensation is provided is untenable. The rates to be paid for

transportation are not the compensation intended by the Fifth Amendment.

This act cannot be sustained on the theory of the United States that the operation of private pipe lines is monopolistic, that the act prohibits their operation (save as common carriers) as an appropriate means to prevent monopolistic results, and that the adoption of this means by Congress is not within the inhibitions of the Fifth Amendment.

There is nothing inherent in the nature or operation of private pipe lines which causes a tendency to monopoly.

Neither the authorities cited nor the debates in Congress nor the Report of the Commissioner of Corporations sustains the Government's position on this point.

Nor does the Report of the Interstate Commerce Commission, dated January 28, 1907.

Cases cited in support of position that the private operation of pipe lines tends to monopoly do not help the Government.

There is no proof of "duress" or "oppression" on part of owners of private pipe lines. Cases cited under this head are irrelevant.

The mere extent of acquisition of business or property achieved by fair and lawful means or commercial dominance fairly resulting from the ownership of private property lawfully obtained is not the criterion of monopoly or monopolization, within the legal meaning of those words. Monopolization is the unlawful exclusion of others from opportunities and privileges which are rightfully theirs. Monopoly, in the legal sense, is the condition resulting from monopolization thus defined.

It follows therefore that the act, even regarded as an act prohibiting the operation of pipe lines save as common carriers, cannot be sustained as an appropriate means to prevent monopoly, because there is no real and substantial relation between what the act ordains and monopoly.

There is no such relation, unless the operation of a private pipe line, in the nature of things, tends to monopolization, and unless that fact would justify a "taking" of property without just compensation, which is not the case.

In fact, there is no prohibition in the act, nor any requirement of election.

The assumed prohibition and requirement to elect, if present in the act, would be unconstitutional.

The right to carry goods from one State to another is not a franchise to be granted or withheld by Congress at its pleasure, but is an inherent right of the citizen, which antedated the Constitution.

The act, as construed by the Government, violates the due process clause.

Each case under the police power is to be interpreted according to its own facts.

The act cannot be sustained, as contended on behalf of the Interstate Commerce Commission, by resorting to the doctrine of the *Elevator* and *Stockyards Cases*, because, as applied to private pipe lines, the act does not regulate a business affected with a public interest, in the sense of those cases.

Neither the utilization by a pipe line company of the right of way of a common carrier railroad for the laying of a pipe line, nor the crossing under a public highway by such pipe line, impresses upon the pipe line or its owner the nature or the obligations of a common carrier.

The Ohio act of 1868 has no bearing upon the controversy.

Prior to the transfer to the Standard Oil Company of New Jersey of the pipe lines now owned by it, their use by the National Transit Company and New York Transit Company did not constitute them common carrier lines. But, even had they been common carrier lines, they would

have been released from the obligations of common carriers upon their transfer to appellee in 1906.

In support of these contentions see, amongst many cases, the following: Amer. & Eng. Encyc. of Law (2d ed.); Angell on Highways (2d ed.); *Barclay* v. *Howell*, 6 Peters, 498; *Bloomfield Gaslight Co.* v. *Calkins*, 62 N. Y. 386; *Ches. & Pot. Tel. Co.* v. *Mackenzie*, 74 Maryland, 36; *Currie* v. *N. Y. Transit Co.*, 66 N. J. Eq. 313; Elliott on Railroads; *Huffman* v. *State*, 21 Ind. App. 449; *Morgan* v. *Louisiana*, 93 U. S. 217; *Oman* v. *Bedford-Bowling Co.*, 134 Fed. Rep. 64; *Pemberton* v. *Dooley*, 43 Mo. App. 176; *Rexford* v. *Knight*, 11 N. Y. 308; *Roebling* v. *Trenton Ry. Co.*, 58 N. J. Law, 666; *Starr* v. *Camden & Atl. R. R. Co.*, 24 N. J. Law, 592; *State* v. *Laverack*, 34 N. J. Law, 201; *Thomas* v. *Ford*, 63 Maryland, 346; *Weller* v. *McCormick*, 52 N. J. Law, 470; *Winter* v. *Peterson*, 24 N. J. Law, 524; *Wright* v. *Carter*, 27 N. J. Law, 76; *Wyoming Coal Co.* v. *Price*, 81 Pa. St. 156.

*Mr. W. S. Fitzpatrick*, with whom *Mr. J. B. F. Cates, Mr. L. W. Keplinger* and *Mr. C. W. Trickett* were on the brief, for appellee in No. 506.

*Mr. Albert L. Wilson* for appellee in No. 507.

*Mr. W. I. Lewis, Mr. Archibald F. Jones* and *Mr. R. R. Lewis*, for appellees in No. 508, submitted.

MR. JUSTICE HOLMES delivered the opinion of the court.

By the act of Congress of June 29, 1906, c. 3591, 34 Stat. 584, the Act to Regulate Commerce was amended so that the first section reads in part as follows: "That the provisions of this Act shall apply to any corporation or any person or persons engaged in the transportation of

oil or other commodity, except water and except natural or artificial gas, by means of pipe lines, or partly by pipe lines and partly by railroad, or partly by pipe lines and partly by water, who shall be considered and held to be common carriers within the meaning and purpose of this Act." Thereafter the Interstate Commerce Commission issued an order requiring the appellees among others, being parties in control of pipe lines, to file with the Commission, schedules of their rates and charges for the transportation of oil. 24 I. C. C. 1. The appellees thereupon brought suit in the Commerce Court to set aside and annul the order, and a preliminary injunction was issued by that court, on the broad ground that the statute applies to every pipe line that crosses a state boundary and that thus construed it is unconstitutional. 204 Fed. Rep. 798. The United States, the Interstate Commerce Commission and other intervening respondents appealed.

The circumstances in which the amendment was passed are known to every one. The Standard Oil Company, a New Jersey corporation, owned the stock of the New York Transit Company, a pipe line made a common carrier by the laws of New York, and of the National Transit Company, a Pennsylvania corporation of like character, and by these it connected the Appalachian oil field with its refineries in the east. It owned nearly all the stock of the Ohio Oil Company, which connected the Lima-Indiana field with its system; and the National Transit Company, controlled by it, owned nearly all the stock of the Prairie Oil and Gas Company, which ran from the Mid-Continent field in Oklahoma and Kansas and the Caddo field in Louisiana to Indiana and connected with the previously mentioned lines. It also was largely interested in the Tide Water Pipe Company, Limited, which connected with the Appalachian and other fields and pursued the methods of the Standard Oil Company about to be described. By the before mentioned and subordinate

lines the Standard Oil Company had made itself master of the only practicable oil transportation between the oil fields east of California and the Atlantic Ocean and carried much the greater part of the oil between those points. Before the recent dissolution the New York and Pennsylvania Companies had extended their lines into New Jersey and Maryland to the refineries and the laws of those States did not require them to be common carriers. To meet the present amendment the Standard Oil Company took a conveyance of the New Jersey and Maryland lines, and the common carrier lines now end at insignificant places where there are neither market nor appliances except those of the Standard Oil, by which it would seem that the whole transport of the carriers' lines is received. There is what seems to be merely a formal breach of continuity when the carriers' pipes stop. The change is not material to our view of the case.

Availing itself of its monopoly of the means of transportation the Standard Oil Company refused through its subordinates to carry any oil unless the same was sold to it or to them and through them to it on terms more or less dictated by itself. In this way it made itself master of the fields without the necessity of owning them and carried across half the continent a great subject of international commerce coming from many owners but, by the duress of which the Standard Oil Company was master, carrying it all as its own. The main question is whether the act does and constitutionally can apply to the several constituents that then had been united into a single line.

Taking up first the construction of the statute, we think it plain that it was intended to reach the combination of pipe lines that we have described. The provisions of the act are to apply to any person engaged in the transportation of oil by means of pipe lines. The words 'who shall be considered and held to be common carriers within the meaning and purpose of this act' obviously are not in-

tended to cut down the generality of the previous declaration to the meaning that only those shall be held common carriers within the act who were common carriers in a technical sense, but an injunction that those in control of pipe lines and engaged in the transportation of oil shall be dealt with as such. If the Standard Oil Company and its coöperating companies were not so engaged no one was. It not only would be a sacrifice of fact to form but would empty the act if the carriage to the seaboard of nearly all the oil east of California, were held not to be transportation within its meaning, because by the exercise of their power the carriers imposed as a condition to the carriage a sale to themselves. As applied to them, while the amendment does not compel them to continue in operation it does require them not to continue except as common carriers. That is the plain meaning as has been held with regard to other statutes similarly framed. *Atlantic Coast Line R. R. Co.* v. *Riverside Mills*, 219 U. S. 186, 195, 203. Its evident purpose was to bring within its scope pipe lines that although not technically common carriers yet were carrying all oil offered, if only the offerers would sell at their price.

The only matter requiring much consideration is the constitutionality of the act. That the transportation is commerce among the States we think clear. That conception cannot be made wholly dependent upon technical questions of title, and the fact that the oils transported belonged to the owner of the pipe line is not conclusive against the transportation being such commerce. *Rearick* v. *Pennsylvania*, 203 U. S. 507, 512. See *Texas & New Orleans R. R. Co.* v. *Sabine Tram Co.*, 227 U. S. 111. The situation that we have described would make it illusory to deny the title of commerce to such transportation, beginning in purchase and ending in sale, for the same reasons that make it transportation within the act.

The control of Congress over commerce among the

States cannot be made a means of exercising powers not entrusted to it by the Constitution, but it may require those who are common carriers in substance to become so in form. So far as the statute contemplates future pipe lines and prescribes the conditions upon which they may be established there can be no doubt that it is valid. So the objection is narrowed to the fact that it applies to lines already engaged in transportation. But, as we already have intimated, those lines that we are considering are common carriers now in everything but form. They carry everybody's oil to a market, although they compel outsiders to sell it before taking it into their pipes. The answer to their objection is not that they may give up the business, but that, as applied to them, the statute practically means no more than they must give up requiring a sale to themselves before carrying the oil that they now receive. The whole case is that the appellees if they carry must do it in a way that they do not like. There is no taking and it does not become necessary to consider how far Congress could subject them to pecuniary loss without compensation in order to accomplish the end in view. *Hoke* v. *United States*, 227 U. S. 308, 323. *Lottery Case*, 188 U. S. 321, 357.

These considerations seem to us sufficient to dispose of the cases of the Standard Oil Company, the Ohio Oil Company, the Prairie Oil and Gas Company and the Tide Water Pipe Company, Limited. The Standard Oil Company of Louisiana was incorporated since the passage of the amendment, and before the beginning of this suit to break up the monopoly of the New Jersey Standard Oil Company. It buys a large part of its oil from the Prairie Oil and Gas Company which buys it at the wells in the Mid-Continent field and transfers the title to the Louisiana Company in that State. Its case also is covered by what we have said.

There remains to be considered only the Uncle Sam Oil

Company.  This company has a refinery in Kansas and
oil wells in Oklahoma, with a pipe line connecting the
two which it has used for the sole purpose of conducting
oil from its own wells to its own refinery.  It would be a
perversion of language, considering the sense in which it
is used in the statute, to say that a man was engaged in
the transportation of water whenever he pumped a pail
of water from his well to his house.  So as to oil.  When,
as in this case, a company is simply drawing oil from its
own wells across a state line to its own refinery for its
own use, and that is all, we do not regard it as falling
within the description of the act, the transportation being
merely an incident to use at the end.  In that case the
decree will be affirmed.  In the others the decree will be
reversed.

*No. 507, Decree affirmed.*

*Nos. 481, 482, 483, 506 and 508, Decrees reversed.*

THE CHIEF JUSTICE concurring.

Agreeing in every particular with the conclusions of the
court and with its reasoning except as to one special sub-
ject, my concurrence as to that matter because of its
importance is separately stated.  The matter to which I
refer is the exclusion of the Uncle Sam Oil Company from
the operation of the act.  The view which leads the court
to exclude it is that the company was not engaged in
transportation under the statute, a conclusion to which I
do not assent.  The facts are these: That company owns
wells in one State from which it has pipe lines to its re-
finery in another State, and pumps its own oil through
such pipe lines to its refinery and the product of course
when reduced at the refinery passes into the markets of
consumption.  It seems to me that the business thus car-
ried on is transportation in interstate commerce within
the statute.  But despite this I think the company is not

embraced by the statute because it would be impossible
to make the statute applicable to it without violating the
due process clause of the Fifth Amendment, since to
apply it would necessarily amount to a taking of the prop-
erty of the company without compensation. It is shown
beyond question that the company buys no oil and by
the methods which have been mentioned simply carries
its own product to its own refinery; in other words, it is
engaged in a purely private business. Under these con-
ditions in my opinion there is no power under the Consti-
tution without the exercise of the right of eminent domain
to convert without its consent the private business of the
company into a public one.

Of course this view has no application to the other com-
panies which the court holds are subject to the act because
as pointed out the principal ones were chartered as com-
mon carriers and they all either directly or as a necessary
result of their association were engaged in buying oil and
shipping it through their pipes; in other words, were
doing in reality a common carrier business, disguised, it
may be, in form, but not changed in substance. Under
these conditions I do not see how it would be possible to
avoid the conclusion which the court has reached without
declaring that the shadow and not the substance was the
criterion to be resorted to for the purpose of determining
the validity of the exercise of legislative power.

Mr. Justice McKenna, dissenting.

I am unable to concur in the judgment of the court or
in the reasoning upon which it is based. I pass by the con-
struction of the amendment of June 29, 1906 (c. 3591, 34
Stat. 584), set out in the opinion, although its application
to the business of appellee companies is in controversy.
I shall assume its application, therefore, and pass to the
other and more serious questions. Extended discussion

of them is not now possible. Indeed, any discussion may not be worth while, as I express only my individual views. In order to be brief, I have to refer to the principles of the decision of the court, and indeed I am impelled more to dissent from them than from the judgment. It is of little consequence, aside from the rights of the appellee companies, whether they are subject to be regulated as common carriers, but it is of great consequence whether the sanctions of property be impaired.

The outside principle of the decision is the power of Congress to regulate interstate commerce, but to assert that power solves none of the difficulties of the questions in the case. I need not pause to demonstrate that the exercise of that power is subject to other provisions of the Constitution, and one of those provisions is invoked by the appellees. It is contended that the act offends the Fifth Amendment in that it takes their property without due process of law. But what is due process of law, and wherein does its requirement limit the power of Congress? Neither question can be answered in a word, and the usual considerations are encountered when the courts are called upon to investigate the limits of legislative power. Autocracy is free from such perplexities. When authority can say, "The State—it is I!" it meets no impediments to its exercise. But that extreme illustration is not necessary. Even a government under a constitution, if it be unwritten, may have a power that leaves nothing for the courts to do other than to enforce the fiats of legislative authority. Under a written constitution, however, there is a sovereignty superior to the legislature, that of the people expressed in the Constitution. How to reconcile legislation with the limitations of the Constitution and leave government practical in its exercise is a problem which comes to this court often. It is the problem in the case at bar. It is to be regretted that there is no indisputable standard for its solution—no indisputable test of

due process of law. We know that an act of legislation does not necessarily satisfy it. It may, however, be sufficient, or, to be more careful and accurate, there may be a regulation of the uses of property whose legality cannot be denied. Regulation is not a taking, and we are brought to the inquiry, what uses of property will subject it to regulation? I mean regulation in a special sense, not in the sense in which all property, whether its uses be public or private, is subject to regulation. "Property," it is said, "becomes of public interest when used in a manner to make it of public consequence, and affect the community at large." "When, therefore, one devotes his property to a use in which the public has an interest, he, in effect, grants to the public an interest in that use, and must submit to be controlled by the public for the common good, to the extent of the interest he has thus created." *Munn* v. *Illinois*, 94 U. S. 113; *Budd* v. *New York*, 143 U. S. 517; *Brass* v. *Stoeser*, 153 U. S. 391; *German Alliance Insurance Co.* v. *Kansas*, 233 U. S. 389. Manifestly the principle needs the definition of the facts of the cases. In three of them the fees for storage of grain were regulated; in the other the price of fire insurance; but dominant in all, as giving character to the property, was the fact that its use was voluntarily offered to the public. There was no compulsion of use or service. This must be kept in mind as the determining circumstance. Conduct may be regulated which cannot be initially commanded. The rates of interest may be regulated, but loans can not be compelled. There is further illustration in a case subsequent to those cited. In *W. W. Cargill Co.* v. *Minnesota*, 180 U. S. 452, an injunction was sought against the operation of an elevator and warehouse situated on the right of way of a railroad until its operator should have obtained a license from the Railroad and Warehouse Commission of the State under a law of the State. The defendant company bought and sold grain, although its

elevator was used for storing its own grain only. The state court decided that the business was of a "public character" and was "sufficiently affected with a public interest to warrant a very considerable amount of regulation of it by the State." This conclusion was put upon the ground that the elevator was a kind of public market place and it was important to see that correct weights were had, uniform grades given, proper amount of dockage taken and no dishonest practice allowed. The provision for a license was sustained. The act, however, provided for many other regulations, among others, for the receipt and storage of the grain of others and the rates of charges therefor. The state court, passing on these and other regulations, said that there were many provisions in the act which applied only to warehouses and elevators in which grain was stored for others or for the public and which could not apply to such warehouses as the one in question, and there were perhaps provisions in the act which it would be unconstitutional to apply to such warehouses. The court, however, said, "Such matters need not be considered at this time. The provision recognizing license is not one of these." One of the judges of the court was of opinion that on account of the interdependence of the provisions of the act many of them, when applied to warehouses not used for the storage of grain by others, were beyond the police power of the State and, therefore, invalid, and made the whole act so. This court, by Mr. Justice Harlan, sustained the judgment of the state court and said "that the mere requirement of a license was not forbidden by the Fourteenth Amendment." Answering the suggestion that other provisions were repugnant to the Constitution of the United States, it was said that the license would give authority to carry on the business under the valid laws of the State and the valid regulations of the Commission. The case, therefore, manifestly decides that the use of the warehouse by others could not

have been legally compelled, and in the other cases, as we have seen, it was the act of the parties, not the power of the law, which devoted the property to the public interest. In the *Munn Case* it was said of the owners of the elevators that there was no attempt to compel them "to grant the public an interest in their property, but to declare their obligations if they used it in this particular manner." And further, "He may withdraw his grant by discontinuing the use; but so long as he maintains the use, he must submit to the control."

In the cases cited, therefore, there was a regulation of uses which were extended voluntarily to others. I recall no case where the use was compelled and by the use so compelled regulation was justified. The case at bar has no fellow in our jurisprudence.

These considerations are not touched upon in the opinion of the court, and how far they affect the decision can only be conjectured. It may be not at all. At any rate, other considerations are given explicit prominence. The impulse of the amendment is said to be the control which the Standard Oil Company had acquired over the pipe-line transportation of oil. It is further said that it availed "itself of its monopoly of the means of transportation" by refusing to carry "through its subordinates any oil unless the same was sold to them and through them to it on terms more or less dictated by itself, and thereby became master of the fields without owning them." It is not very clear whether this is intended as a statement merely of the motive of the amendment or of its legal justification. If stated as the motive of the amendment I have no concern with it; as a justification of the amendment its foundation must be considered

The facts of the cases the opinion of the court does not give. They are, however, quite necessary to a discussion of the questions which they present. I quote the summary of the Commerce Court (p. 802):

"The Prairie Oil and Gas Company is a corporation organized in 1900 under the laws of the State of Kansas. It owns and operates a system of pipe lines consisting of gathering lines in the mid-continent field, in the States of Kansas and Oklahoma, a trunk line from that field to Griffith in the State of Indiana, where it connects with the Indiana pipe line, and a trunk line in the State of Arkansas, connecting the Oklahoma pipe line with the pipe line of the Standard Oil Company of Louisiana. This company has no refinery, and its business is confined to producing, purchasing, and selling crude oil, which it delivers to its customers by means of the pipe lines described. Its own wells yield only about 12,000 barrels per day and it purchases approximately 70,000 barrels per day on the average. Its trunk lines are about 860 miles in length, of which some 300 miles are located on the right of way of the Atchison, Topeka & Santa Fe Railway Company under contract arrangement with that company.

"The Uncle Sam Oil Company is a corporation organized in 1905 under the laws of the State (then Territory) of Arizona. It owns and operates a pipe line from its wells in the State of Oklahoma to its refinery at Cherryvale, Kans. The extent to which this company purchases oil from other producers, if it engages in that business at all, does not appear from the record.

"Robert D. Benson et al. are the members of a partnership, organized in 1878 for the term of 20 years and reorganized in 1898 for a further term of 20 years, in compliance with the laws of the State of Pennsylvania, and doing business under the name of the Tide-Water Pipe Co. (Ltd.). This company transports oil from the Appalachian field in the western part of Pennsylvania, and also oil received through connecting lines from other fields, to the Tide-Water Oil Co. refinery at Bayonne, in the State of New Jersey. It also owns and operates branch lines in New York and Pennsylvania, and a line extending

from Stoy, Ill., through the States of Illinois, Indiana, Ohio, and Pennsylvania. The greater part of the crude oil transported by this company is purchased from other producers. The lines which it owns and the Bayonne refinery which it serves are under common or unified control.

"The Ohio Oil Co. is a corporation organized in 1887 under the laws of the State of Ohio. It owns and operates pipe lines in the States of Ohio, Indiana, and Illinois and also leases and operates a line from Negley, Ohio, to Centerbridge, in the State of Pennsylvania. It is an extensive purchaser of crude oil from other producers.

"Standard Oil Company, designated, for convenience, 'Standard Oil Company of New Jersey,' is a corporation organized in 1882 under the laws of the State of New Jersey, and its principal pipe lines are the following: (a) A line extending from Unionville, in the State of New York, near the boundary line of New Jersey, through the latter State to its refineries at Bayonne; (b) a line from Centerbridge, in the State of Pennsylvania, near the boundary of New Jersey, through the latter State to its refineries at Bayonne and Bayway; and (c) a line from Fawn Grove, in the State of Pennsylvania, near the boundary of Maryland, through the latter State to its refinery at Baltimore. The record indicates that much the greater part of the oil transported through these lines, and perhaps all of it, is oil which this company has purchased.

"The Standard Oil Company of Louisiana is a corporation organized in 1909 under the laws of that State. It owns and operates a refinery at Baton Rouge and a trunk line extending thereto from the town of Ida, near the northern line of Louisiana, and also gathering lines in the Caddo field, in the States of Louisiana and Texas. It purchases a considerable part of the crude oil which its lines transport.

"None of the petitioning corporations is organized or

derives any of its corporate powers from laws of the State of its creation under which common carrier or other public service corporations are organized, but each of them was formed and has always conducted its operations under and in compliance with state laws which relate to private as distinguished from public business."

The companies do not possess the right of eminent domain, and their lines are laid over private rights of way, except some of them for short distances 'have laid their lines along the rights of way of certain railroads under some contract arrangement with the railroads, one of them for a distance of about 300 miles. They, however, have in many instances also laid their lines across or along public streets and highways by permission or consent of the local authorities. None of them has ever held itself out as a common carrier or in fact ever carried oil for others, but they have carried only such oil as they produced from their own wells or purchased from other producers and which they owned when the transportation took place.

Concluding its recitation of facts, the Commerce Court said (p. 803): "In short, so far as their legal status is fixed by the laws of the States of their creation, and so far as their acts and attitude could make them such, all the petitioners [appellee companies] carry on a private business, at least in the sense that they transport only their own oil and have always refused to transport for others; and all of them have evidently sought and claimed to so conduct their operations as to avoid any public activity which might subject them to public regulation."

These being the facts, it is yet insisted that the appellee companies are common carriers "in substance" and Congress by its action has only made them so "in form," and that this is unquestionably within the power of Congress. But there is something more to be considered than an antithesis of words. There is an antithesis of

legal consequences—the subjecting of property to other uses than those of its owner. A manifest taking, therefore.

But let me get away from any appearance of considering words or forms of expression to an estimation of the facts. The Standard Oil Company of New Jersey is made prominent, and the exemplar of all of the other companies, and its stock ownership in some of them is assumed to destroy their individuality and unite them all in operation, character and effect. Indeed, it is represented as the single controlling force and master of the transportation of oil "between the oil fields east of California and the Atlantic ocean." Under its sway are pictured all the other companies except the Standard Oil of Louisiana, the latter company, however, having a baneful potency of dictation to the other owners in the oil fields, as has its exemplar, the Standard Oil of New Jersey. In other words it is argued the companies have made themselves masters of their respective fields by the constraint of the sale of the oil of other owners to them upon terms more or less dictated by them by availing themselves of their "monopoly of the means of transportation." This is the charge. The facts of the case do not sustain it except as they exhibit the advantages of the possession of property which others do not possess. Must it be shared by those others for that reason? The conception of property is exclusiveness, the rights of exclusive possession, enjoyment and disposition. Take away these rights and you take all that there is of property. Take away any of them, force a participation in any of them and you take property to that extent. These are commonplaces, but at times—it may be always—commonplaces are our best guides when rights are concerned. They are pertinent to this case. The employment of one's wealth to construct or purchase facilities for one's business greater than others possess constitutes no monopoly that does not appertain to all property. Such facilities may give

advantages and, it may be, power; so does all property and in proportion to its extent. It may well then, be asked—What extent of trade advantages, what degree of power in purchasing, what superiority in facilities of transportation or disposition of articles may be grounds of the exercise of congressional control? If the owner of a small oil well may be given rights in the facilities of the appellee companies, why may not the owner of a small business be given rights in the facilities of a larger business, if Congress sees fit to say that the public welfare requires the gift? Can any privilege be claimed for oil that cannot be claimed for other commodities? May a jobber of merchandise in Washington who conducts a trade in Baltimore and other places and owns special facilities for the transportation of his merchandise, be compelled to share them with competitors who may not be able to afford as ample ones and in consequence be forced to sell their property to him at a disadvantage? Or, recurring to the illustration of *W. W. Cargill Co.* v. *Minnesota*, can one who erects elevators for the storage of grain of his own raising (such instances exist) and uses it as well for grain of his purchase (there are more of such instances), be compelled to share their advantage with other growers or purchasers of grain? The advantages of his situation are quite as manifest as the advantages the appellees enjoy and the effect on interstate commerce transportation as marked. Upon the same principle, one who builds a railroad to a coal field or to a forest must share it with other owners in the field or forest if he ventures to purchase their productions. Such is the principle of the present decision. Under it what attribute of private property is left?

Let us not exaggerate the conditions or by form of statement put out of view essential elements. What duress is employed that is not employed when terms are exacted as a condition of the use of property? Or, rather,

and more accurately, what duress is used except the exclusion of others from the use of property which they do not own? There were no prior or present rights in other owners of oil wells to the use of the lines of the appellee companies. They contributed nothing to the construction of the lines and their exclusion from their use is the exclusion resulting from the separate ownership of property as distinguished from rights of community ownership.

There is quite a body of opinion which considers the individual ownership of property economically and politically wrong and insists upon a community of all that is profit-bearing. This opinion has its cause, among other causes, in the power—may I say the duress?—of wealth. If it accumulates 51% of political power, may it put its conviction into law and justify the law by the advancement of the public welfare by destroying the monopoly and mastery of individual ownership?

I submit, with deference, that it is misleading to say that the use of the lines by other oil owners was permitted only on terms dictated by the companies, and that through such dictation they "became masters of the fields without owning them." And I take it if the companies had not made purchases of oil or refused offers of oil, they would not be held subject to the act. Such is the situation of the Uncle Sam Company and the ground of decision in regard to that company. It is not held to be within the act. It seems to be minimized and considered not big enough for the application of the law, and yet it owns and operates a pipe line from the oil fields of Oklahoma to its refineries in Kansas. The extent to which it purchases oil from producers, if it does so at all, does not appear from the record. It may be supposed that if it venture to make purchases of oil it will lose its immunity. But why its exemption? Why is the fact of purchases of oil important? Is it not the concern of the small oil owners to get to market? Indeed, is not that the advantage they get

from the law thereby being able to break away from the supposed subjection to, and "duress" of, the superior advantages of the appellee companies? The result which the amendment under review was intended to effect was beneficial to the public welfare. The query then occurs, May all of the other oil companies give up their purchases and, if they should, will they thereby get the freedom of the Uncle Sam Company? What then of the owners of oil? It may be they cannot sell their oil at all—the local market is taken from them—a distant market is not possible for them. Is not the public welfare concerned for them in such situation? Must they remain in it dependent upon the richer owner balancing the advantages of remaining under the law or becoming free from it? Or may the power which has brought them to such situation extricate them from it by one more act of legislation in the public interest and to take from the companies their mastery of the fields of production?

*United States* v. *Delaware & Hudson Co.*, 213 U. S. 366, opens a curious speculation and illustrates the effect of the power exercised in the legislation under review. The appellee companies, the decision is, engaging in interstate commerce may be declared common carriers and made to carry the products of others as well as their own products. Then, having been made common carriers, under the authority of the cited case, they can be forbidden to carry their own products, and so by legal circumlocution property legally devoted to the use of its owners is forbidden such use and devoted wholly to the use of others. A queer outcome.

I have extended this discussion beyond what I had intended. Much more, however, could be said and decisions adduced on the various elements of the case. Prophecies of the result of the principles of the decision could be made which I am afraid could not be pronounced fanciful, and projects whose shadows may even now be discerned

will plead a justification by the decision in these cases. It is to be remembered that there are many jurisdictions of legislation. It is to be remembered that there cannot be one measure of control for Congress over private property and its uses and another measure of control for the States. In other words, the power which Congress has in its domain, the States have in their domain. Alarms, however, are not arguments, and I grant that legislation must be practical. But while making this concession, and giving to the legislation in question the presumption of constitutionality to which all legislation is entitled, I am yet constrained to say that it transcends the limits of the power of regulation and takes property without due process of law.

As I have not the power of decision, I do not enter into a discussion of the facts which distinguish the cases. It may be that the judgment of the Commerce Court as to the Standard Oil Company should be reversed because the lines of the Company were common carriers before their acquisition, and it may be that the Prairie Oil & Gas Company was made a common carrier by the law which created it. This, however, is in controversy.

I concur in the judgment as to the Uncle Sam Oil Company. From the judgments as to the other companies, I dissent.