## VALVOLINE OIL CO. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION, Intervener).

### No. 3421.

District Court, W. D. Pennsylvania.

Dec. 3, 1938.

Brandon & Brandon and J. Campbell Brandon, all of Butler, Pa., and Harry S. Elkins, of Washington, D. C., for petitioner.

Thurman Arnold, Asst. Atty. Gen., Elmer B. Collins, of Washington, D. C., and Frank Coleman, Sp. Assts. to Atty. Gen., for respondent United States.

Walter M. W. Splawn, Chairman of I. C. C., W. P. Bartel, Secretary of I. C. C., Daniel W. Knowlton, Chief Counsel for I. C. C., and Thomas M. Ross, all of Washington, D. C., for I. C. C., for respondent Interstate Commerce Commission.

Before MARIS, Circuit Judge, and GIBSON and SCHOONMAKER, District Judges.

MARIS, Circuit Judge.

This is a proceeding to enjoin and set aside an order of the Interstate Commerce Commission. The petition sought an interlocutory injunction. A hearing was had pursuant to Section 47, Title 28, United

States Code, 28 U.S.C.A. § 47, which by agreement of the parties is to be considered as the final hearing of the cause. From the evidence the court makes the following findings of fact:

The business of the Valvoline Oil Company (hereinafter referred to as the Valvoline) originated in a partnership formed some seventy years ago for the purpose of manufacturing lubricating oil. A small pipe line was constructed near Warren, Pa.. through which oil was gathered for shipment in tank cars to the refinery at Edgewater, N. J. Later, a refinery was built at Warren and some of the oil was refined there and some at Edgewater. In 1901 the company was incorporated under the laws of the State of New Jersey and by its charter was authorized to engage in the production, transportation, manufacture, and marketing of petroleum oil and its products, without, however, the right of eminent domain in New Jersey. At the time of its incorporation it was refining about 22,000 barrels of oil per month.

As the demand for lubricating oil grew the pipe line system was gradually extended southward, following the development of new oil fields in Pennsylvania, and in 1909 another and larger refinery was added at East Butler, Pa. The movement of oil in that year amounted to about 55,000 barrels per month. Up to that time all of the oil transported by the Valvoline moved intrastate. Interstate transportation began in 1913 upon the extension of the line from Pennsylvania into West Virginia, and in 1916 the West Virginia-Ohio line was crossed. The last major additions were in 1925 and 1926 when a gathering system serving pools in Ritchie County, W. Va., was purchased and lines were laid in southeastern Ohio. The Valvoline now operates 1,426 miles of pipe line, consisting of 969 miles of 2-inch pipe, 426 miles of 3-inch pipe, and 31 miles of 4-inch pipe. About 50 percent of the oil transported originates in Pennsylvania, 38 percent in West Virginia, and 12 percent in Ohio.

Several other oil pipe lines, both common carrier and private, extend through or are in close proximity to the fields served by the Valvoline. The common carrier pipe lines are the National Transit Company and the South-West Pennsylvania Pipe Lines, in Pennsylvania, the Eureka Pipe Line Company, in West Virginia, and the Buckeye Pipe Line Company, in Ohio. None of the companies serves the wells from which the Valvoline receives its oil.

The Valvoline is not a producer of oil. From the inception of the enterprise it has been its practice to purchase all of the crude oil used by it directly from the producers in the field. It carries, therefore, only oil of which it is the owner. For its manufacturing purposes it prefers a selected grade of a light amber color and some of the oils produced along its lines are not satisfactory because too dark or because they contain undesirable ingredients difficult to eliminate in the refining process. It refuses to buy or admit into its lines oils that do not meet its specifications and the producers thereof must therefore find an outlet through other pipe lines and sales to other refiners. Several instances of rejections of oil by the Valvoline are mentioned in the record. Any producer, however, within reasonable distance of the Valvoline's lines, having oil of the desired quality and not already receiving pipe line service, is afforded a market for his oil through sale to the Valvoline, and if his well is located in Ohio or West Virginia, or in Pennsylvania south of the Butler-Allegheny county line, he receives a premium of 5 cents per barrel over the posted market price.

In November, 1937, the pipe lines of the Valvoline were serving exclusively 9,020 wells, of which 6,291 were in Pennsylvania, 1,370 in West Virginia, and 1,359 in Ohio. These are generally so-called stripper wells from which the average daily run is 0.20 barrel in Pennsylvania, 0.56 barrel in West Virginia, and 0.25 barrel in Ohio. The oil was then being collected in 2,678 tanks owned by the producers and located on 2,075 farms. Because of the slow accumulation of the oil many of these tanks are drained as infrequently as once a year and in some instances only once in four years. The Valvoline serves actually less than 500 producers or groups, but by reason of fractional interests in royalties and leases it has dealings with and accounts to 2,014 royalty owners and 1,751 lease operators for the oil it purchases. These owners and operators have no other present outlet for their oil. According to testimony of record, in the event the Valvoline should refuse to accept it, they could receive service from one of the common carrier pipe line companies provided they were able to tender at least 5 barrels per day per mile of pipe line extension necessary to make the connection. In view of the fact that the average run of oil from all the wells served by the

Valvoline is but little over half a barrel per day, this requirement would undoubtedly deprive many of the producers of a pipe line outlet and market for their oil.

In 1932 economic conditions brought about a curtailment of operations and the refinery at Warren was closed. The Valvoline, instead of limiting its purchases to the quantity of oil that could be refined at East Butler, continued as before to purchase all oil of suitable grade offered, with the result that it received and has continued to receive an excess of oil over its ability to refine. Having no use for this oil in its own operations it entered into arrangements with the Pennsylvania Refining Company at Karns City, Pa., and with the Ohio Valley Refining Company at St. Marys, W. Va., under which it sells and delivers to those companies the excess of oil over its own requirements. The oil sold to the Pennsylvania Refining Company all originates in Pennsylvania and its movement through the Valvoline's lines is intrastate. At the time of the first hearing before the Interstate Commerce Commission some of the oil sold to the Ohio Valley Refining Company originated in Ohio and moved across the Ohio-West Virginia state line. Sale of the Ohio oil was thereafter discontinued and deliveries to the plant at St. Marys now consist exclusively of oil originating in West Virginia. In both instances the oil is sold at delivered prices which include amounts to cover the cost of transportation.

On December 31, 1934 the Commission issued a general order known as Valuation Order No. 26 requiring all pipe line companies subject to the Interstate Commerce Act, 49 U.S.C. c. 1, § 1 et seq., to prepare and file with the Commission maps, charts and schedules of their property not less than sixty days after written notice from the Commission. The Valvoline was served with such notice in January, 1936, whereupon it petitioned the Commission to determine its status, asserting that it was not subject to the act. After hearing the Commission, by Division 1, issued a report on February 2, 1937, holding that the Valvoline was engaged in the transportation of oil by pipe line in interstate commerce, that it was a common carrier subject to the provisions of the Interstate Commerce Act and that it should, therefore, comply with Valuation Order No. 26.

Thereafter the Valvoline, having ceased the sale to the Ohio Valley Refining Com-

pany of oil transported from Ohio to West Virginia, petitioned for and was granted a rehearing before the full Commission and on June 6, 1938 the Commission filed its report again finding that the Valvoline was a common carrier of oil by pipe line and subject to the provisions of the Interstate Commerce Act. The Commission accordingly affirmed its original report and on the same day entered an order directing the Valvoline to comply with the provisions of Valuation Order No. 26 within ninety days. The present suit was brought to set aside this order. After the commencement of the suit the Commission extended the time for compliance with its order for a further period of ninety days.

Discussion.

The question for determination in this case is whether the Valvoline Oil Company is a common carrier within the meaning of the Interstate Commerce Act to the extent that the Commission may require it to file maps and other information required for the valuation by the Commission of its pipe line property.

The pertinent provisions of the Interstate Commerce Act, as amended, 49 U.S.C. c. 1, § 1 et seq., under which the Commission acted, are as follows:

"Section 1. (1) The provisions of this Act shall apply to common carriers engaged in—

"(a) * * *

"(b) The transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water; or * * *

"(3) The term 'common carrier' as used in this Act [chapter] shall include all pipe-line companies; * * * express companies; sleeping-car companies; and all persons, natural or artificial, engaged in such transportation or transmission as aforesaid as common carriers for hire. * * *

"§ 19a. (a) The commission shall, as hereinafter provided, investigate, ascertain, and report the value of all the property owned or used by every common carrier subject to the provisions of this Act [chapter]. * * *

"(e) Every common carrier subject to the provisions of this Act [chapter] shall furnish to the commission or its agents from time to time and as the commission may require maps, profiles, contracts, re-

ports of engineers, and any other documents, records, and papers, or copies of any or all of the same, in aid of such investigation and determination of the value of the property of said common carrier, * *."

The provisions of Section 1 above quoted are as amended by Section 400 of the Transportation Act, 1920. Prior to the passage of that Act, Section 1 had been amended by the Act of June 29, 1906, c. 3591, 34 Stat. 584, known as the Hepburn Act, so as to include the following provisions relating to pipe line companies:

"Sec. 1. That the provisions of this Act shall apply to any corporation or any person or persons engaged in the transportation of oil or other commodity, except water and except natural or artificial gas, by means of pipe lines, or partly by pipe lines and partly by railroad, or partly by pipe lines and partly by water, who shall be considered and held to be common carriers within the meaning and purpose of this Act, * * *."

These provisions remained in the Act until Section 1 was re-arranged and re-phrased by the Transportation Act, 1920.

█ In 1906, when the Hepburn Act was passed, the Valvoline was not engaged in the interstate transportation of oil. It did not undertake that business until several years later. When it did so, it thereby assumed the status, by virtue of the provisions of the Hepburn Act, of a common carrier within the meaning and purpose of the Act. This followed from the very terms of the Act which, as we have seen, provided that the Interstate Commerce Act should apply to any corporation engaged in the interstate transportation of oil by means of pipe lines and that such a corporation should be considered and held to be a common carrier within the meaning and purpose of the Act. In other words, it imposed upon a pipe line company the status of a common carrier within the meaning of the Act as a condition of its engaging in the interstate transportation of oil. The Pipe Line Cases, U. S. v. Ohio Oil Co., 234 U.S. 548, 34 S.Ct. 956, 58 L.Ed. 1459; Pierce Oil Co. v. Phoenix Refining Co., 259 U.S. 125, 42 S.Ct. 440, 66 L.Ed. 855. The fact that the interstate transportation carried on by the Valvoline involved only oil which it itself owned did not operate to exclude it from the provisions of the Hepburn Act since that Act was not restricted to pipe line companies which were common carriers in a technical

sense but included all pipe line companies engaged in the interstate transportation of oil with the exception of those merely engaged in transporting oil from their own wells to their own refineries for their own use. The Pipe Line Cases, supra.

█ It thus appears that the Valvoline had voluntarily assumed the status of a common carrier within the meaning and purpose of the Interstate Commerce Act prior to the passage of the Transportation Act, 1920. That Act, as we have seen, somewhat changed the language of Section 1 of the Interstate Commerce Act. It provided that the Act should apply to common carriers engaged in the interstate transportation of oil by pipe line and that the term "common carrier" as thus used should include "all pipe-line companies; * * * and all persons, natural or artificial, engaged in such transportation or transmission as aforesaid as common carriers for hire." We think that this rephrasing of the language of the Hepburn Act worked no change in its meaning. The language used must be construed to mean that all pipe line companies even though not technically common carriers are to be deemed common carriers as that term is used in the Act and that in addition all individuals or corporations engaged in transporting oil by pipe line as common carriers for hire are to be deemed common carriers within the meaning of the Act even though technically they are not pipe line companies. It necessarily follows that the Valvoline continued after the passage of the Transportation Act, 1920, to have the status of a common carrier within the meaning of the Interstate Commerce Act.

█ Section 19a of the Act authorizes the Commission to value the property of every common carrier subject to its provisions and requires such common carriers to furnish the Commission with such maps and such other information as it may require in aid of such a valuation. Proceeding under this statutory authority the Commission in the present case ordered the Valvoline to furnish information necessary for the purpose of valuing its property. This order, we think, was within its statutory power and was validly entered against the Valvoline as a common carrier subject to the Commission's jurisdiction.

█ The Valvoline argues, however, that its operations are so small as compared with the companies involved in the Pipe Line Cases, supra, that the application of

the Interstate Commerce Act to its business would be unreasonable and arbitrary and would, therefore, deprive it of its property without due process of law in violation of the fifth amendment to the Constitution, U.S.C.A.Const. Amend. 5. It is well settled, however, that considerations of the size and importance of the business to be regulated are addressed to legislative discretion and not to legislative power. Brass v. State of North Dakota, Same v. Stoeser, 153 U.S. 391, 14 S.Ct. 857, 38 L.Ed. 757. Furthermore it appears that the business of the Valvoline, while not so extensive as that of the companies involved in the cases referred to, is essentially similar thereto in that it takes all oil meeting its specifications which is offered to it by the owners of the wells connected with its lines and to most of them it offers the only available market for their oil.

It is equally clear that the imposition upon the Valvoline of the status of a common carrier subject to the provisions of the Act as a condition of its engaging in interstate transportation did not amount to the taking of its property without just compensation in violation of the fifth amendment. We are satisfied that under the Commerce clause the Congress had power to impose such a condition upon those desiring to engage in the interstate transportation of oil by pipe line. See United States v. Delaware & Hudson Co., 213 U.S. 366, 29 S.Ct. 527, 53 L.Ed. 836; Atlantic Coast Line v. Riverside Mills, 219 U.S. 186, 31 S.Ct. 164, 55 L.Ed. 167, 31 L.R.A.,N.S., 7; The Pipe Line Cases, supra; Edwards v. United States, 9 Cir., 91 F.2d 767.

We, therefore, decide that the Valvoline is subject to the provisions of Section 19a of the Interstate Commerce Act authorizing the Commission to value its pipe line property and requiring it to co-operate by furnishing relevant data. That is the only question involved in the case. The case does not involve, and we of course do not decide, any question as to the extent of the other obligations which may have been imposed upon the Valvoline by the Act. The court accordingly reaches the following conclusions of law:

The Valvoline Oil Company is a common carrier engaged in the interstate transportation of oil by pipe line within the meaning of the Interstate Commerce Act to the extent that it is subject to the provisions of Section 19a of the Act.

The order of the Interstate Commerce Commission entered June 6, 1938 directing the Valvoline Oil Company to comply with the provisions of the Commission's Valuation Order No. 26 was within the Commission's statutory powers and was constitutional.

The petition of the Valvoline Oil Company for an injunction enjoining the enforcement of the said order should be dismissed.

A decree dismissing the petition will be entered.