**PENNSYLVANIA R. CO. et al. v. PITTS-BURGH, L. & W. R. CO. et al.**

No. 6891.

Circuit Court of Appeals, Sixth Circuit.

May 9, 1936.

862

John C. Bane, Jr., of Pittsburgh, Pa., George H. P. Lacey, of Cleveland, Ohio, and John J. Heard, of Pittsburgh, Pa. (Thomas M. Kirby and H. J. Crawford, both of Cleveland, Ohio, S. G. Cramp, of Pittsburgh, Pa., Albert Ward, of Philadelphia, Pa., Squire, Sanders & Dempsey, of Cleveland, Ohio, and Reed, Smith, Shaw & McClay, of Pittsburgh, Pa., on the brief), for appellants.

Don Rose, of Pittsburgh, Pa. (Frederick L. Leckie and John T. Scott, both of Cleveland, Ohio, John B. Eichenauer, Howard M. Swartz, and Rose & Eichenauer, all of Pittsburgh, Pa., August G. Gutheim, of Washington, D. C., and Duncan, Leckie, McCreary, Schlitz & Hinslea and M. B. & H. H. Johnson, all of Cleveland, Ohio, on the brief), for appellees.

Before MOORMAN, SIMONS, and ALLEN, Circuit Judges.

ALLEN, Circuit Judge.

This case arises on an appeal from a decree dismissing a bill and supplemental bill of complaint which prayed in substance that appellees be perpetually enjoined from constructing or continuing the construction of any line of railroad or extension between Smith's Ferry, Pennsylvania, and Negley, Ohio, and from taking any steps toward the consummation of such purpose until a certificate of public convenience and necessity authorizing such construction or extension shall have been issued by the Interstate Commerce Commission.

Appellants are common carrier railroads operating from the Pittsburgh coal fields to the city of Youngstown, Ohio. Appellee Pittsburgh Coal Company (hereinafter called the Coal Company) is a Pennsylvania corporation authorized to engage in the mining of coal, the transportation of coal to market, and the marketing thereof. It owns large tracts of coal lands with outlets upon the Monongahela River, containing high volatile coal having a low ash and sulphur content, for which there is a large demand in the northeastern section of Ohio and in the Youngstown district. These mines are called "river mines," because they are accessible to the river, as distinguished from mines which have their outlet by rail. In order to transport the coal from the "river mines" to market, the Coal Company operates its own fleet of river barges and towboats which transport the coal to Smith's Ferry, Pennsylvania, situated on the Ohio River near the mouth of Little Beaver Creek.

In 1927 the Coal Company purchased all of the capital stock of appellee The Pittsburgh, Lisbon & Western Railroad Company (hereinafter called the Lisbon), a common carrier between New Galilee, Pennsylvania, and Lisbon, Ohio. Shortly thereafter a new board of directors was elected for the Lisbon, consisting largely of officers and employees of the Coal Company. In January, 1929, the Lisbon purchased approximately ninety-nine per cent. of the capital stock of appellee Youngstown & Suburban Railway Company (hereinafter called the Youngstown & Suburban), which operated an unprofitable electric line from Youngstown to Columbiana and Leetonia, Ohio. The officers and management of the Coal Company dominate the actions and business of the two newly acquired railroads. A joint in-

come tax return is filed by all three companies, and the improvements of the Youngstown & Suburban have been financed by loans from the Coal Company.

The Coal Company's conceded purpose in purchasing the Lisbon was to secure transportation of its coal to the Youngstown market at a cost lower than the rates charged by appellants for similar transportation. Immediately after the Lisbon was purchased it applied to the Interstate Commerce Commission for authority to build an extension from Mill Rock, Ohio, to Youngstown, Ohio, 28.4 miles, and from Negley, Ohio, to Smith's Ferry, Pennsylvania, 13.3 miles. The Coal Company and various important shippers supported the application, which was opposed by appellants. On December 16, 1928, the Commission indicated that it would refuse the Lisbon's application if appellants furnished facilities for removing coal from barges on the Ohio River and placing it in railroad cars for transportation. This appellants did, and thereupon the Lisbon's application was refused.

After the purchase of the Youngstown & Suburban by the Lisbon, the interurban's charter was amended to authorize construction of a branch line from Columbiana, Ohio, to a point in or near East Liverpool, Ohio. On September 26, 1929, the Lisbon sold to the Coal Company all of its Youngstown & Suburban stock. During the years 1929 and 1930, the Youngstown & Suburban built a branch line from Columbiana connecting with the main line of the Lisbon at Signal, Ohio, and on May 26, 1931, the charter of the Youngstown & Suburban was amended to allow it to use steam motive power.

Subsequent to the denial of the application for extension by the Interstate Commerce Commission, the Lisbon constructed a spur track from its main line at Negley down the valley of Little Beaver Creek for about one-half mile. In 1931 and 1932 the Coal Company purchased a strip of land connecting the south end of this half-mile spur and Smith's Ferry, Pennsylvania. Part of the strip was bought from the Lisbon.

Upon this strip of land the Coal Company has constructed at its own cost a standard gauge railroad track with tunnels and numerous bridges, capable of carrying a large amount of heavy traffic, which track is physically connected with the Lisbon spur near Negley. Since the filing of

this suit the Coal Company has erected at Brush Run, two miles south of Negley, connected with the track, a coal washing plant, designed for cleaning, sizing and sorting coal for market. Other plant facilities, including a low temperature carbonization plant, are planned to be erected in the vicinity. The carbonization plant will permit the Coal Company to utilize slack coal (which is usually wasted) in the making of coke. The Coal Company intends to employ on this track only its own locomotives and cars handled by its own employees, and will make and permit no use of such track or equipment by other shippers. This testimony is not controverted.

The District Court dismissed the bill upon the ground that the Coal Company has the lawful right to construct and operate as a private enterprise its private railroad track upon its own land, and that the construction and operation of this track for private purposes is not within the provisions of section 1, paragraphs 18 to 22, of the Interstate Commerce Act, 49 U.S. C.A. § 1 (18–22), requiring a certificate of public convenience and necessity, and that this private track can not be deemed to be an extension of the Lisbon.

Appellants urge that the denial of the application of the Libson, the subsequent purchase of the Youngstown & Suburban, its extension and improvement financed by the Coal Company, and the steps taken in the building of the track from Negley to Smith's Ferry, considered as a whole, demonstrate that the paramount purpose of the Coal Company is to violate the order of the Interstate Commerce Commission and to secure the very extension denied to its subsidiary. It is contended that the courts have always held that the applicable sections of the Interstate Commerce Act, title 49, U.S.C., section 1, paragraphs 3 and 18–22 (49 U.S. C.A. § 1 (3, 18–22), must be construed to prevent evasion of the law (Cf. Texas & Pacific R. Co. v. Gulf, Colorado & Santa Fe R. Co., 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578), and that it is the policy of these sections to preserve the earning capacity and the financial resources of individual carriers. Under this record it is shown that the building of this track will divert traffic from appellants who rely upon the rule that competition between carriers is a matter of national concern because injury to the railroads ultimately

864

falls upon the public. Cf. Texas & Pacific R. Co. v. Gulf, Colorado & Santa Fe R. Co., supra. The difficulty with this contention, which states a correct general rule, is that these sections[1] govern (1) construction by common carriers for use in interstate commerce, and (2) competition between common carriers and not private construction for private transportation. It is true that, as contended, the United States Supreme Court has broadly interpreted these sections in order to secure the paramount purpose of the act. To that end it has held that the construction of a spur or branch line lying wholly within one state (Texas & Pacific R. Co. v. Gulf, Colorado & Santa Fe R. Co., supra), requires a certificate of convenience and necessity from the Interstate Commerce Commission even though under a literal reading of Section 1 (22)[2] such a construction is exempt from the Commission's authority. This intrastate spur was to be constructed by a common carrier and to be used in interstate commerce. In Piedmont & Northern R. Co. v. Interstate Commerce Commission, 286 U.S. 299, 52 S.Ct. 541, 76 L.Ed. 1115, the court declared that an interurban railroad, part of an interstate system, could not make extensions without securing a certificate from the Commission. The extensions contemplated were part of an interstate system of common carriage.

The decision most strongly supporting appellants' position is Southern Pacific Terminal Co. v. Interstate Commerce Commission, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310, in which the Supreme Court sustained the validity of an order made by the Interstate Commerce Commission. There a holding corporation owned the stock of certain railways, and also owned the stock of a terminal company. The terminal company leased one of its wharves to an individual and its two other wharves for public use. This resulted in a discrimination to the direct financial advantage of the individual lessee. The Interstate Commerce Commission inquired into the discrimination, and the terminal company resisted, claiming that since it was not a common carrier, the Commission had no jurisdiction. The Supreme Court held that the control and operation by the Southern Pacific Company of the railroads and the terminal company had united them into a system of which all are necessary parts, and that as the terminal company forms a link in this chain of transportation used as an instrument of inter-

[1] The Interstate Commerce Act (title 49, U.S.C., § 1 (3, 18, 20), 49 U.S.C.A. § 1 (3, 18, 20).

Section 1 (3) Definitions. The term "common carrier" as used in this chapter shall include all pipe-line companies; telegraph, telephone, and cable companies operating by wire or wireless; express companies; sleeping-car companies; and all persons, natural or artificial, engaged in such transportation or transmission as aforesaid as common carriers for hire. Wherever the word "carrier" is used in this chapter it shall be held to mean "common carrier." The term "railroad" as used in this chapter shall include all bridges, car floats, lighters, and ferries used by or operated in connection with any railroad, and also all the road in use by any common carrier operating a railroad. * * *

Section 1 (18) Extension or abandonment of lines; certificate required. No carrier by railroad subject to this chapter shall undertake the extension of its line of railroad, or the construction of a new line of railroad, or shall acquire or operate any line of railroad, or extension thereof, or shall engage in transportation under this chapter over or by means of such additional or extended line of railroad, unless and until there shall first have been obtained from the commission a certificate that the present or future public convenience and necessity require or will require the construction, or operation, or construction and operation, of such additional or extended line of railroad. * * *

Section 1 (20) Issuance of certificate by commission; unlawful extension or abandonment of lines. The commission shall have power to issue such certificate as prayed for, or to refuse to issue it, or to issue it for a portion or portions of a line of railroad, or extension thereof, described in the application, or for the partial exercise only of such right or privilege, and may attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require. * * *

[2] Section 1 (22) Construction, etc., of spurs, switches, etc., within State. The authority of the commission conferred by paragraphs (18) to (21), both inclusive, shall not extend to the construction or abandonment of spur, industrial, team, switching, or side tracks, located or to be located wholly within one State, or of street, suburban, or interurban electric railways, which are not operated as a part or parts of a general steam railroad system of transportation.

state commerce, it might not escape the regulation of the Commission on the ground that one of its constituents is a wharfage company instead of a common carrier, and that it is not in fact owned by any railway company.

Appellants urge that under the analogy of this holding, the control and operation by the Coal Company of its common carrier subsidiaries have united them into a system of which all are necessary parts, and that this system is used as an instrument of interstate commerce. It is claimed that the track follows substantially the same route as the extension asked by the Lisbon, and is to be used for the same purpose, and that hence the Coal Company is evading the law in building this track without securing a certificate of public convenience and necessity. The record does not support these contentions. The track between Negley and Smith's Ferry is not an instrument of interstate commerce, for no one other than the Coal Company can use it. Although the Coal Company has secured a track which it can use in its private enterprise, both legally and as matter of fact the track is not an extension of the Lisbon. It is a purely private facility for the private transportation of the Coal Company's product. It is significant that while in the Southern Pacific Terminal Company Case, supra, the main enterprise was interstate commerce through a number of railroads, the main enterprise of the Coal Company is the mining and the marketing of coal. Its transportation upon the lands of the Coal Company or on the lines of the Lisbon and the Youngstown & Suburban is wholly incidental to the principal purpose of the parent company. There is no interstate commerce in the shipment of this coal by means of private transportation facilities before it reaches the Brush Run preparation plant. There the Coal Company has supplied needed facilities for processing the coal. Prior to the erection of the Brush Run plant the Coal Company used the transfer stations of the appellants at Conway and Colona. This use was unsatisfactory, as the coal was broken and deteriorated, due to the lack of retarding conveyers which allow the coal to drop into the cars without breakage. The Brush Run plant remedies this difficulty, refining the coal by removing extraneous mineral matters, and later classifies it into some twenty-five different sizes. It is then consigned from

this plant to buyers in Northeastern Ohio and in states beyond; and here at Brush Run, in Ohio, interstate commerce begins.

It is not contradicted that the Coal Company has dominated its subsidiaries and borne the expense of these projects. Neither the Lisbon nor the Youngstown & Suburban, however, has had anything to do with the building of the track from Negley to Smith's Ferry. Since the coal is carried over this track by its owner, in its own private vehicles, in order to reach its own private plant, its transportation does not constitute interstate commerce. The Pipe Line Cases (United States v. Uncle Sam Oil Company), 234 U.S. 548, 562, 34 S.Ct. 956, 58 L.Ed. 1459. This decision construed a specific enactment of Congress which gave the Interstate Commerce Commission jurisdiction over persons or corporations engaged in the transportation of oil in interstate commerce. The court held that this statute was constitutional, and that pipe line companies which, although not technically common carriers, were carrying all oil offered only when the offerers would sell at the price fixed by the pipe line companies, were common carriers in everything but form and subject to the jurisdiction of the Commission. However, with reference to the Uncle Sam Oil Company a contrary conclusion was reached. This company had a refinery in Kansas and oil wells in Oklahoma. A pipe line connected the refinery and the oil wells, and was used for the sole purpose of conducting oil from the company's own wells to its own refinery. The Supreme Court held that when, as in this case, a company is simply drawing oil from its own wells across a state line to its own refinery for its own use, and that is all, it does not fall within the purview of the act because the transportation is merely an incident to use at the end. It is impossible to distinguish the Uncle Sam Oil Company Case from the instant case with the exception of the fact that the track from Negley to Smith's Ferry is connected with a common carrier owned by the Coal Company. In fact the instant case is stronger than the Uncle Sam Oil Company Case because no statute declares that a coal company which transports coal to market is a common carrier. Although Congress has enacted the commodity clause of the Hepburn Act, 34 Stat. c. 3591, p. 585, § 1 (49 U.S.C.A. § 1 (8) and note, forbidding the transportation by railroads of coal mined and owned by them except such as may be necessary and

intended for their use in the conduct of their business as common carriers, Congress has not yet seen fit to enact a statute dealing with the converse of the situation and making it illegal for a coal company to own and operate a common carrier in its own interest.

These conclusions are supported by the decision of the United States Supreme Court in Pennsylvania R. Co. v. Public Utilities Commission of Ohio, 56 S.Ct. 687, 689, 80 L.Ed. ——, announced on April 27, 1936. That case involved the authority of the Public Utilities Commission of Ohio to fix intrastate switching rates at Youngstown, Ohio, on the carriage of coal from Negley, Ohio, upon the tracks of the Lisbon and the Youngstown & Suburban to Youngstown, where there are interchange facilities with the Pennsylvania and the Erie Railroads. It was held that the transportation of the coal from Negley, Ohio, to Youngstown, Ohio, was an intrastate service not subject to the provisions of the Interstate Commerce Act, and its character in that regard was not changed because of preliminary carriage from the Pennsylvania mines in barges and cars belonging to the shipper. The court, after pointing out that the Interstate Commerce Act, 49 U.S.C. 1, et seq. (49 U.S.C.A. § 1 et seq.), applies to common carriers exclusively, finds that the Pittsburgh Coal Company is not such a common carrier, and that it furnishes implements of carriage for its own use only for the transportation between Pennsylvania and Ohio. The court says: "Appellants would have us hold that this interstate transportation by an owner who does not carry for any one else will be tacked to the intrastate transportation by railroads who are in business as common carriers, and the movement thus consolidated brought within the statute. The statute and the decisions as we read them forbid this unifying process."

The court further says: "Neither in the cases cited by the appellants nor in any others known to us has transportation by a common carrier been combined with carriage by an owner for the purpose of subjecting the whole to the operation of the statute when the parts would be exempt. Such a fusion, if permitted, would lead to strange results. The situation laid before us would not be changed in its essentials if a co-operative association of farmers doing business in Pennsylvania close to the state line were to use a fleet of trucks belonging to the association or its members to carry milk or vegetables from Pennsylvania to a railroad station in Ohio. Even though this were done systematically and not casually or in sporadic instances, the ensuing transportation by rail, if kept within Ohio, would not be transportation between the states within the meaning of the act of Congress. If the concept of transportation is in need of expansion, it is for the legislative department of the government to determine how great the change shall be."

While the contention urged here, that the ownership by the Coal Company of a controlling interest in the shares of the Lisbon and the Youngstown & Suburban affects the nature of the transit between Negley. and the mines, is not specifically considered, we think that this point, by necessary implication, also is disposed of by the statements quoted.

The decree of the District Court is affirmed.