### CHAMPLIN REFINING CO. v. UNITED STATES (INTERSTATE COMMERCE COMMISSION, Intervener).

#### Civil Action No. 1559.

District Court, W. D. Oklahoma.

March 21, 1945.

Dierker, U. S. Dist. Atty., of Oklahoma City, Okl., for defendant.

Nelson Thomas, Interstate Commerce Commission, and Daniel W. Knowlton, Chief Counsel Interstate Commerce Commission, both of Washington, D. C., for intervening defendant.

Before MURRAH, Circuit Judge, and VAUGHT and CHANDLER, District Judges.

CHANDLER, District Judge.

This is a suit to enjoin, set aside and annul an order of the Interstate Commerce Commission, dated June 12, 1944, requiring plaintiff to comply with the provisions of the Commission's valuation procedure, as authorized by 49 U.S.C.A. § 19a.

This Court's jurisdiction is based upon statutory provisions authorizing suit to be brought against the United States and requiring trial before a court of three judges, 28 U.S.C.A. § 41 (28), 28 U.S.C.A. §§ 45, 46, 47 and 48. These provisions refer to suits to enjoin, set aside, annul, or suspend any order of the Interstate Commerce Commission.

Plaintiff, Champlin Refining Company, is a corporation organized under the laws of New Mexico with charter powers to produce, buy, sell and transport petroleum, to refine petroleum and to buy, sell and deal in the refined products of petroleum. It operates a refinery at Enid, Oklahoma, being authorized by the State of Oklahoma to do business within its borders.

The crude oil supplied to the refinery is obtained from numerous producing wells throughout the State of Oklahoma, some owned by plaintiff and some owned by other parties. It is collected and brought to the Enid Refinery by pipe lines of plaintiff's wholly owned subsidiary, Cimarron Valley Pipe Line Company.

The pipe line under consideration extends from plaintiff's refinery at Enid, Oklahoma, across Kansas, Nebraska, and a part of South Dakota, to Rock Rapids, Iowa. The construction of the line was begun by the Cimarron Valley Pipe Line Company in 1935 and completed as far as Superior, Nebraska, in the latter part of that year. The Cimarron Valley Pipe Line Company sold and conveyed its pipe line to Superior, Nebraska, to the Champlin Refining Company, on June 10, 1935, before it was ever used. An extension of the pipe line from Superior, Nebraska, to

Harry O. Glasser, of Enid, Okl., and Dan Moody, of Austin, Tex., for plaintiff.

Edward Dumbauld and W. B. Watson Snyder, Sp. Asst. Attys. Gen., Wendell Berge, Asst. Atty. Gen., and Charles E.

Rock Rapids, Iowa, was completed about May 1, 1940. The total cost of construction as of December, 1940, was $3,198,028.66.

The line is 516 miles long, constructed of six inch welded pipe, is seamless and has no connection with any other pipe line. It is so constructed and equipped that products can be discharged from it only at Hutchinson, Superior and Rock Rapids. Plaintiff operates storage tanks and railroad and truck delivery facilities at these terminals. All products transported are owned by plaintiff and refined at its refinery at Enid, Oklahoma.

Plaintiff sells the products transported over the pipe line in "spot-market" and "contract" sales in both of which types of transactions the purchaser pays an amount equal to the refinery price at Enid, Oklahoma, plus an amount designated as a "differential". This differential is an amount equal to the through railroad rate from Enid, Oklahoma, to destination, less the charges paid out by the purchaser for the short-haul transportation from the pipe line terminal to destination. The charges, however, are modified in some sales to meet the competitive prices made by other refineries.

The line is not used as a "gathering line" to bring crude oil to the refinery from the producing wells. The Cimarron Valley Pipe Line Company is employed for that purpose. It is what is known as a "products pipe line" used for the transportation of refined petroleum products. In the construction of the line, the right of way was secured by purchase and not by condemnation proceedings. Some condemnation proceedings were instituted by the Cimarron Valley Pipe Line Company prior to the purchase of the line by the plaintiff, but subsequently were dismissed and the property purchased.

Plaintiff publishes no tariffs with the Interstate Commerce Commission, or any other regulatory body, and accepts no oil products for transportation for other parties, or the general public. It does not permit any person, firm, or corporation, other than itself, to use its pipe line, its facilities, or anything pertaining to them, as a means of transportation of petroleum or any other commodity.

The only question involved is whether plaintiff is a "pipe line company" within the terms of the Interstate Commerce Act.

In 1906 the Interstate Commerce Act was amended to read as follows:

"Sec. 1. That the provisions of this Act shall apply to any corporation or any person or persons engaged in the transportation of oil or other commodity, except water and except natural or artificial gas, by means of pipe lines, * * * who shall be considered and held to be common carriers within the meaning and purpose of this Act, and to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad * * * from one State or Territory of the United States, * * * to any other State * * *." 34 Stat. 584.

In 1920 the Act was further amended to read as follows:

"(1) That the provisions of this Act shall apply to common carriers engaged in—

\* \* \* \* \*

"(b) The transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line, * * *

"(c) * * * from one State * * * to any other State.

\* \* \* \* \*

"(3) The term 'common carrier' as used in this Act shall include all pipe-line companies; * * * and all persons, natural or artificial, engaged in such transportation or transmission as aforesaid as common carriers for hire. * * *" 41 Stat. 474. * * *

"19a. That the commission shall, as hereinafter provided, investigate, ascertain, and report the value of all the property owned or used by every common carrier subject to the provisions of this Act." 37 Stat. 701. 49 U.S.C.A. §§ 1(1) (b, c), (3), 19a.

The construction of the Act was before the Court in Pipe Line Cases, 234 U.S. 548, 34 S.Ct. 956, 58 L.Ed. 1459, and Valvoline Oil Co. v. United States, 308 U.S. 141, 60 S.Ct. 160, 84 L.Ed. 151.

In Pipe Line Cases the Court was considering interstate pipe lines already engaged in transportation at the time of the passage of the 1906 amendment. The matter under consideration was the constitutionality of the act as applied to such companies. It held that certain of the companies were common carriers in substance if not in form and fell within the coverage of the Act even though engaged in the business at the time of the amendment.

With reference to the Standard Oil Company of Louisiana which was incorporated after the passage of the amendment, the Court held the act applicable for this same reason or because it entered the business of interstate transportation of oil by pipe line after the passage of the 1906 amendment.

As to the Uncle Sam Oil Company, the Court held that, being engaged in transporting its own oil for its own use, the transportation involving neither purchase nor sale, such transportation was not transportation in commerce. The Court also undoubtedly took into consideration the fact that the company having entered the field as a purely private pipe line prior to the passage of the 1906 amendment and having vested rights, arbitrary classification of such line as a common carrier would be unconstitutional.

■ The Uncle Sam Oil Company case must be distinguished from the instant case upon the ground that plaintiff is transporting oil products *to market for sale to the public* and thus is engaged in transportation in commerce within the meaning of the Act. The time of transfer of title, whether at Enid, Oklahoma, or at Hutchinson, Superior, Rock Rapids or at purchaser's place of business, is technical. In either instance the public pays the transportation charge. A charge or "differential" equal to rail rates is added in "spot-market" sales to the current price of the oil products at Enid, Oklahoma, on the date of the delivery. In "contract" sales the products are sold at contract price for an agreed period of time plus this same "differential".

In either "spot" or "contract" sales the effect on the public is the same as if title passed to the purchaser at the refinery. The purpose of the broad coverage of the Act was to make it impossible for pipe line carriers to escape its terms upon such technicalities.

In the Valvoline Oil Co. case, the company asserted that the oil flowing through its lines was not in commerce until *after* preparation for market, thereby admitting that after such preparation the transportation would be in commerce. In the instant case, the products are refined products being transported to market and are, therefore, transported in commerce.

We think the foregoing conclusions are inescapable from consideration of the plain terms of the Act and the following quotation from the opinion in Pipe Line Cases [234 U.S. 548, 34 S.Ct. 958]:

*"The only matter requiring much consideration is the constitutionality of the act.* That the transportation is commerce among the states we think clear. That conception cannot be made wholly dependent upon technical questions of title, and the fact that the oils transported belonged to the owner of the pipe line is not conclusive against the transportation being such commerce. * * * The situation that we have described. would make it illusory to deny the title of commerce to such transportation, beginning in purchase and ending in sale, for the same reasons that make it transportation within the act. The control of Congress over commerce among the states cannot be made a means of exercising powers not intrusted to it by the Constitution, but it may require those who are common carriers in substance to become so in form. *So far as the statute contemplates future pipe lines and prescribes the conditions upon which they may be established there can be no doubt that it is valid. So the objection is narrowed to the fact that it applies to lines already engaged in transportation."* (Emphasis supplied.)

Plaintiff attempts to demonstrate that it does not fall within the coverage of the Act by asserting that it is not in fact a common carrier. The Act makes it a *statutory* common carrier.

The fact, if true, that plaintiff is a private carrier is immaterial since it is covered by the Act and chose to enter the business of transportation of oil products after the enactment thereof.

■ In our opinion, the plain meaning of the Act as amended is that its provisions apply to *all engaged in the interstate transportation of oil or other commodities, except water and except natural or artificial gas, by pipe line.*

The Act states that its provisions shall apply to "common carriers engaged in * * * the transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line". It then defines the term "common carrier" to include "all pipe line companies * * * and all persons, natural or artificial, engaged in such transportation or transmission as aforesaid as common carriers for hire".

In the Valvoline Oil Co. case the Court, in referring to the last clause of the definition of "common carrier" said [308 U.S. 141, 60 S.Ct. 162]:

"This clause is a conjunctive and not a modifier. It does not affect the generality of the first clause as to pipe-line companies."

The Court said in the Pipe Line Cases in construing the 1906 amendment:

"The provisions of the act are to apply to any person engaged in the transportation of oil by means of pipe lines."

Congress intended to include all pipe lines without regard to whether they were private lines or carried for the public.[1]

In the Valvoline Oil Co. case the Court held that the provision in the 1920 amendment that the Act applied to "all pipe-line companies" did not narrow the coverage of the Act. *We think this change in verbiage was made for the purpose of making it clear, if any doubt was created by the Uncle Sam Oil Company decision, that all future pipe lines engaged in the interstate transportation of oil or other commodities, except water and natural or artificial gas, were covered by its terms.*

 The contention is made that plaintiff is not an interstate pipe line company; that it is a refining company. It is authorized by its charter, among other things, to transport petroleum. It produces and purchases oil and, through its wholly owned subsidiary, Cimarron Valley Pipe Line Company, transports it by pipe line from points in Oklahoma to its refinery at Enid, Oklahoma, and after refining, transports the products *from* its refinery through its own line to Kansas, Nebraska and Iowa for the purpose of sale. Plaintiff could just as logically take the position that it is a "producer" or "carrier".

Valvoline Oil Company was engaged in the refining business, had similar charter powers, and transported oil *to* its two refineries. The Court there stated:

"There is no controversy over whether appellant is an interstate pipe line company. *Obviously it is.*" (Emphasis supplied.)

 As in the Valvoline Oil Co. case, plaintiff claims that to hold the Act applicable to it amounts to the taking of its property without due process of law. This contention is answered by the Court in the Pipe Line Cases. Plaintiff is a "future" pipe line company.

Plaintiff's petition to enjoin and annul the order of the Interstate Commerce Commission should be dismissed. Defendant is requested to prepare and submit findings of fact, conclusions of law and judgment in accordance with the views herein expressed.

VAUGHT, District Judge (dissenting).

I regret the necessity of disagreeing with the majority opinion.

In the majority opinion, however, the facts are fairly and clearly stated, as well as the issue of law.

Were we considering the Act of Congress, 49 U.S.C.A. § 1(3), for the first time, I might be constrained to agree with my associates in their conclusion. However, the Supreme Court has considered this very question in The Pipe Line Cases, 234 U.S. 548, 34 S.Ct. 956, 58 L.Ed. 1459, and Valvoline Oil Co. v. United States et al., 308 U.S. 141, 60 S.Ct. 160, 84 L.Ed. 151.

The question at issue is whether or not, for the purposes of valuation, the pipe line of the plaintiff is a common carrier within the terms of Section 1, Chapter 1, of the Act, 49 U.S.C.A. § 1.

The suit also involves the question of whether the required compliance with the Commission's valuation order would constitute a violation of the Constitution of the United States, by taking property of the plaintiff without just compensation, depriving it of its property without due process, or denying it equal protection of the law.

The pertinent sections of the statute are as follows:

49 U.S.C.A. § 1:

"(1) The provisions of this chapter shall apply to common carriers engaged in—

\* \* \* \* \*

---

[1] An amendment was suggested in the Senate limiting the coverage to pipe lines "carrying for the public". Senator Lodge opposed this and in sponsoring the amendment as passed stated:

"But the amendment suggested by the Senator from Ohio to my amendment, to the effect that no pipe line, unless it carries for the public shall come, under this rule, will, as the Senator from Minnesota (Mr. Nelson) says, absolutely destroy the value of my amendment." 40 Cong.Rec. 6361—65.

"(b) The transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water; or

"(c) * * * from one State * * * to any other State.

* * * * *

"(3) Definitions. The term 'common carrier' as used in this chapter shall include all pipe-line companies; telegraph, telephone, and cable companies operating by wire or wireless; express companies; sleeping-car companies; and all persons, natural or artificial, engaged in such transportation or transmission as aforesaid as common carriers for hire. * * * "

49 U.S.C.A. § 19a:

"(a) The commission shall, as hereinafter provided, investigate, ascertain, and report the value of all the property owned or used by every common carrier subject to the provisions of this chapter.

* * * * *

"(e) Every common carrier subject to the provisions of this chapter shall furnish to the commission or its agents from time to time and as the commission may require maps, profiles, contracts, reports of engineers, and any other documents, records, and papers, or copies of any or all of the same, in aid of such investigation and determination of the value of the property of said common carrier, * * * "

This case involves the interpretation of the statute as it pertains to the facts presented, and the distinguishing features, if any, between the facts shown in The Pipe Line Cases, supra, and Valvoline Oil Co. v. United States et al., supra.

In The Pipe Line Cases, the court had under consideration the act as it was amended June 29, 1906, 34 Stat. 584 (known as the Hepburn Act), in which section 1(3) then read:

"That the provisions of this Act shall apply to any corporation or any person or persons engaged in the transportation of oil or other commodity, except water and except natural or artificial gas, by means of pipe lines, or partly by pipe lines and partly by railroad, or partly by pipe lines and partly by water, who shall be considered and held to be common carriers within the meaning and purpose of this Act, * * * "

In the body of the opinion at page 559 of 234 U.S., 34 S.Ct. 958, 58 L.Ed. 1459, the court said:

" * * * The main question is whether the act does and constitutionally can apply to the several constituents that then had been united into a single line.

"Taking up first the construction of the statute, we think it plain that it was intended to reach the combination of pipe lines that we have described. The provisions of the act are to apply to any person engaged in the transportation of oil by means of pipe lines. The words 'who shall be considered and held to be common carriers within the meaning and purpose of this act' obviously are not intended to cut down the generality of the previous declaration to the meaning that only those shall be held common carriers within the act who were common carriers in a technical sense, but an injunction that those in control of pipe lines and engaged in the transportation of oil shall be dealt with as such. * * * Its evident purpose was to bring within its scope pipe lines that, although not technically common carriers, yet were carrying all oil offered, if only the offerers would sell at their price.

" * * * So far as the statute contemplates future pipe lines and prescribes the conditions upon which they may be established there can be no doubt that it is valid. So the objection is narrowed to the fact that it applies to lines already engaged in transportation. But, as we already have intimated, those lines that we are considering are common carriers now in everything but form. They carry everybody's oil to a market, although they compel outsiders to sell it before taking it into their pipes. * * * "

In that case the Standard Oil Company controlled a number of pipe lines of other organizations, which, when taken together, formed a pipe line for transportation of oil across several states, and as stated by the court in 234 U.S. at page 559, 34 S.Ct. at page 958, 58 L.Ed. 1459:

" * * * To meet the present amendment the Standard Oil Company took a conveyance of the New Jersey and Maryland lines, and the common carrier lines now end at insignificant places where there are neither market nor appliances except those of the Standard Oil, by which it would seem that the whole transport of the carriers' lines is received. * * *

"Availing itself of its monopoly of the means of transportation the Standard Oil Company refused, through its subordinates, to carry any oil unless the same was sold to it or to them, and through them to it, on terms more or less dictated by itself. * * *"

There can be no question but that the oil thus transported, at the time of its transportation, was owned by the Standard Oil Company and that it was transporting its own oil through its own pipe line. The court then considered the Uncle Sam Oil Company and held that the facts as to that company did not fall within the description of the act as the transportation by that company was "merely an incident to use at the end," and said:

"There remains to be considered only the Uncle Sam Oil Company. This company has a refinery in Kansas and oil wells in Oklahoma, with a pipe line connecting the two which it has used for the sole purpose of conducting oil from its own wells to its own refinery. It would be a perversion of language, considering the sense in which it is used in the statute, to say that a man was engaged in the transportation of water whenever he pumped a pail of water from his well to his house. So as to oil. When, as in this case, a company is simply drawing oil from its own wells across a state line to its own refinery, for its own use, and that is all, we do not regard it as falling within the description of the act, the transportation being merely an incident to use at the end. * * *"

The plaintiff contends it falls squarely within the holding as to the Uncle Sam Oil Company.

In Valvoline Oil Co. v. United States, supra, Valvoline Oil Company owned a pipe line of 1,426 miles running to 9,020 wells in three states, into which it gathered some 75,000 barrels of oil per month for its two refineries in Pennsylvania which manufactured the products to be distributed to its trade. All of the oil was purchased from producers at the well, 50 per cent. originating in Pennsylvania, 38 per cent. in West Virginia, and 12 per cent. in Ohio. Surplus oil, not needed in its operations in its refineries, was sold to refineries in Pennsylvania and West Virginia; none of which came out of the state of the refinery. Because it did not transport interstate other oil than that which it purchased at the well for its own use, it claimed it was not a common carrier of oil subject to the Interstate Commerce Act, nor that it should be held to come within the terms of the statute. It contended that it was not a common carrier within the provisions of the act, that its pipe line was used primarily to transport oil to its own refineries, and that such transportation was not clothed with a public interest. The court, in passing upon the issues, said (308 U.S. page 145, 60 S.Ct. 162, 84 L.Ed. 151):

"In the present Act there is a change of language but we perceive none in meaning. Speaking of the amendments of the Transportation Act of 1920 * * * which recast the Hepburn Amendment into the present form, the House Committee on Interstate and Foreign Commerce reported that the section here under consideration 'amends the first five paragraphs of section 1 of the Commerce Act, making minor corrections and classifying language in several respects, but making no important changes in policy.' As now written the section brings railroads under the Act by means of the last clause of subsection (3) only. This clause is a conjunctive not a modifier. It does not affect the generality of the first clause as to pipe-line companies.

"The appellant relies upon the Pipe Line Cases to show that the present act does not cover a pipe line transporting oil for its own refining purposes only. The discussion referred to is that concerning the Uncle Sam Oil Company. But that company's pipe line was used for the *sole purpose of conducting oil from its own wells to its own refinery.* This was held not to be transportation under the Act. Here, however, *it is the purchase from many sources* and subsequent carriage that determine the applicability of the statute to Valvoline." (Emphasis supplied.)

Under the holding in The Pipe Line Cases it was determined that not every "pipe line" that may be engaged in the transportation of oil is a common carrier, within the terms of the statute, even though it transports oil across state lines, and the Uncle Sam Oil Company's line was held to be an exception. In the Valvoline Case that distinction under the statute as amended was recognized and maintained, the court saying: "But that company's pipe line was used for the 'sole purpose of conducting oil from its own wells to its own refinery.'" While in The Pipe Line Cases the court said: "When, as in this case, a company is simply drawing oil from its own wells across a state line to its own

refinery, for its own use, and that is all, we do not regard it as falling within the description of the act, the transportation being merely an incident to use at the end."

Let us now consider the facts in The Pipe Line Cases and the Valvoline Case as distinguished from the facts shown in the instant case.

In The Pipe Line Cases the Standard Oil Company owned or controlled the pipe lines, which were engaged in transporting the oil from many owners. The court described the situation as follows, (234 U.S. 559, 34 S.Ct. 958, 58 L.Ed. 1459):

"Availing itself of its monopoly of the means of transportation the Standard Oil Company refused, through its subordinates, to carry any oil unless the same was sold to it or to them, and through them to it, on terms more or less dictated by itself. In this way it made itself master of the fields without the necessity of owning them, and carried across half the continent a great subject of international commerce coming from many owners, but, by the duress of which the Standard Oil Company was master, carrying it all as its own. * * *

"It not only would be a sacrifice of fact to form, but would empty the act if the carriage to the seaboard of nearly all the oil east of California were held not to be transportation within its meaning, because by the exercise of their power the carriers imposed as a condition to the carriage a sale to themselves. * * * Its evident purpose was to bring within its scope pipe lines that, although not technically common carriers, yet were carrying all oil offered, if only the offerers would sell at their price."

In the instant case we have none of these distinguishing features. The Champlin Refining Company is not engaged in "carrying all oil offered" but is carrying only its own refined product. It is not monopolizing "the means of transportation" of oil. It is not refusing to carry oil unless it is sold to it on its terms or any other terms. It simply is not engaged in carrying any oil except its own product, refined at its own refinery, and transported for its own use to its own terminals.

In the Valvoline Case, the Valvoline Oil Company had two refineries in Pennsylvania. Its pipe lines embraced 1,426 miles which ran to 9,020 wells located in Pennsylvania, West Virginia, and Ohio. It gathered from these wells some 75,000 barrels of oil per month for the purpose of refining the product to be distributed to its trade. It could not use all the oil so gathered in its refineries and sold the surplus to other refineries, located one in Pennsylvania and one in West Virginia. I think the court distinguishes the fact situation in the Valvoline Case from the case at bar when it said: *"Here, however, it is the purchase from many sources and subsequent carriage that determine the applicability of the statute to Valvoline."*

In the instant case the Champlin Refining Company is not gathering through its pipe line the product it transports. The product it transports originates at its own refinery at Enid, Oklahoma. As so originated, it is owned by the company in its entirety, the pipe line being "merely an incident to use at the end," which is the marketing of its product. And, as stated by the court in the Valvoline Case, supra, in distinguishing between the facts there shown and the facts shown in The Pipe Line Cases, as to the Uncle Sam Oil Company: "But that company's pipe line was used for the 'sole purpose of conducting oil from its own wells to its own refinery.' This was held not to be transportation under the Act."

Is the general public interested in such transportation as shown in the case at bar? The record does not disclose that anyone has sought to have oil transported through this pipe line. It does not disclose that the company transports any product but its own, nor that it holds itself out to the public as a carrier of the product of any who offer to avail themselves of its facilities, but on the contrary, it discloses that the line is constructed and maintained in such a manner that such facilities would not be available to any such transportation. It merely shows that the Champlin Refining Company refines its own product at its own refinery and transports it to market with its own facilities, for its own use, which use is to place it on the market. Certainly, the fact that the plaintiff added to the price of its products at its terminals what it considered to be a fair sum to cover the cost of transportation, would not and could not interest the buying public. It would have to compete with others at the market who were offering products of a like kind. The record discloses that its means of transportation had cost a large sum of money and that it had to maintain

its transportation facilities, if it was an "incident to use at the end."

There is a distinct difference between a pipe line engaged in *interstate commerce* and a pipe line which is a *common carrier*. In the first instance the pipe line may or may not be a common carrier. The determining factors are the use to which the pipe line is put and the statute which defines "common carrier."

If a pipe line is not operated for hire, then the statute, as construed by The Pipe Line Cases and the Valvoline Case, would not apply.

For the foregoing reasons, therefore, I respectfully dissent to the majority opinion.