**CHAMPLIN REFINING CO. v. UNITED STATES et al.**

Civ. No. 4562.

United States District Court, W. D. Oklahoma.

July. 12, 1950.

Judgment Modified May 7, 1951.

See 71 S.Ct. 715.

Harry O. Glasser, Enid, Okl., and Dan Moody, Austin, Tex. (Nathan Scarritt and E. S. Champlin, Enid, Okl., on the brief) for plaintiff.

William D. McFarlane, Special Asst. to the Atty. Gen. (Frederick R. Hanlon, Special Atty., Washington, D. C., Herbert A. Bergson, Asst. Atty. Gen., James E. Kilday, Special Asst. to the Atty. Gen., Robert E. Shelton, U. S. Atty., Oklahoma City, Okl. on the brief) for the United States.

S. R. Howell, Atty., Interstate Commerce Commission, Washington, D. C. (Daniel W. Knowlton, Chief Counsel, Interstate Commerce Commission and H. L. Under-

wood, Asst. Chief Counsel, Interstate Commerce Commission, Washington, D. C., on the brief) for intervening defendant.

Before PHILLIPS and MURRAH, Circuit Judges, and VAUGHT, District Judge.

PHILLIPS, Circuit Judge.

Champlin Refining Company [1] brought this action seeking a judgment enjoining the Interstate Commerce Commission [2] from enforcing an order requiring Champlin "to file with the * * * Commission annual, periodical, or special reports as required by the provisions of paragraphs (1) and (2) of Section 20 of the Interstate Commerce Act [3] * * * and the orders and regulations of the * * * Commission made pursuant thereto"; "to institute and henceforth maintain a uniform system of accounts applicable to pipe lines, as required by the provisions of paragraphs (3), (4) and (8) of Section 20 of the Interstate Commerce Act * * * and the orders and regulations of the * * * Commission made pursuant thereto," and "to publish and file tariff schedules showing the rates and charges for interstate transportation of refined petroleum products between different points on its own route and between points on its own route and points on the route of any other carrier by railroad, by pipe line, or by water when a through route and joint rate have been established, upon notice to" the Commission and the general public "by not less than 30 days' filing and posting in the manner prescribed in Section 6 of the Interstate Commerce Act," and adjudging such orders to be invalid.

Champlin owns and operates a pipe line extending from its refinery at Enid, Oklahoma, to storage tanks owned by it at Hutchinson, Kansas, Superior, Nebraska, and Rock Rapids, Iowa. The only openings in the pipe line are at the refinery at Enid and at such storage tanks. Such pipe line has no connection with any other pipe line. Champlin could not transport the petroleum products of others without constructing facilities for receiving such products into its line and without constructing terminal facilities for delivering such products at the end of their transportation. Champlin uses the pipe line exclusively for the moving of gasoline, kerosene and tractor fuel from its refinery at Enid to such storage tanks. Such petroleum products so moved are discharged from its pipe line into such storage tanks where, at times and before the sale thereof, certain blending of the products is done, which necessarily has an effect on their quality. At the three terminals Champlin maintains loading racks designed to load products from the storage tanks into railroad tank cars and tank trucks. Champlin is the manfacturer and sole owner of all of the products moved through its pipe line. It has never transported products belonging to any other person, firm or corporation. It has never proffered the service of its pipe line to any other person, firm or corporation, exchanged with any other person, firm or corporation any petroleum products which have moved through its pipe line, filed any tariffs or rates with the Commission, or with any state regulatory agency, or assumed or exercised the right of eminent domain in connection with its pipe line.

Champlin markets the products that move through its pipe line only after they have come to rest in storage tanks at one of the three terminals, and in certain instances after additional processing. All products which have been shipped through the pipe line belong to Champlin and it retains title thereto until sales are made from its bulk storage tanks at one of the terminals. In no instance has it made a sale on condition that the product sold would be shipped by means of the pipe line.

A prior action brought by Champlin, Champlin Refining Co. v. United States, D. C., 59 F.Supp. 978; Id, 329 U.S. 29, 67 S. Ct. 1, 91 L.Ed. 22, involved an order of the Commission requiring Champlin to file under the provisions of § 19a of the Interstate Commerce Act, inventory, schedules,

---

1. Hereinafter called Champlin.
2. Hereinafter called the Commission.

3. 49 U.S.C.A. § 20.

maps and charts of its pipe line property, in compliance with Commission Valuation Orders Nos. 26 and 27.

At the time of the trial of the prior case, there was involved in Champlin's marketing system a factor, which for convenience was referred to as the "differential," being a sum added to the sale price of products F.O.B. the Enid refinery.[4] The amount to be so added was determined by competitive prices in the marketing areas, and was a device for meeting competitors' prices. The differential was a sum, which when added to the sale price at the Enid refinery, resulted in a sale price f.o.b. the pipe line terminals, that enabled the purchaser to move the products from the storage tanks, where he made his purchase, to his place of business by means of his own choice, with a total resulting cost to him that did not exceed the sum for which he could have bought such products from Champlin's competitors, delivered to the purchaser's place of business. Sometimes, but not always, depending upon competitive prices, the differential would equal or approximate the difference between the cost of the through freight haul from the Enid refinery to the purchaser's place of business, less the cost of the local freight haul from the storage tanks to the purchaser's place of business. However, the differential varied constantly, depending upon the price at which competitors in the market territory were selling like products. Competitive prices, and not the cost of transportation or freight charges, determined the amount of differential. Any relation between the differential and the cost of transportation was incidental, because the controlling factor in arriving at the amount of the differential was the price at which the stronger marketers in the market territory offered their products for sale.

On May 10, 1948, and before the promulgation of the orders here involved, Champlin abandoned the differential method of pricing. In lieu of that method Champlin has adopted the policy of posting prices at each of its terminals. Where competitive marketing conditions require it, Champlin makes allowances from the posted prices so that purchasers in such instances buy below the posted prices and thus Champlin meets the competitive market prices in the sale of its products. These allowances range from $\frac{1}{8}$ to $\frac{1}{2}$ cent per gallon, which are substantial amounts, and enable Champlin to put its products on the market in competition with other stronger marketers in the market area. On May 10, 1948, the change in pricing method reflected net increases or decreases of from $\frac{1}{2}$ cent to $\frac{1}{8}$ cent per gallon at more than 70 per cent of the destinations served by Champlin out of its Superior and Rock Rapids terminals.

The capacity of Champlin's pipe line is 9,800 barrels per day, as against common carrier pipe line capacity of 172,800 barrels per day, available to refineries in Oklahoma and Kansas. Champlin's pipe line capacity is approximately five per cent of the total products pipe line capacity serving Superior, and seven per cent of the total pipe line capacity serving Rock Rapids. It is the smallest pipe line serving the territory. Only 1.98 per cent of all the gasoline consumed in the area served by Champlin's pipe line is moved through its pipe line and sold from its terminal storage facilities. Champlin occupies such a relatively minor place in the gasoline market in the middle west that it is in no position to control the price of gasoline, kerosene, or tractor fuel, either by raising or lowering the price thereof. It is in no position to support price advances against its competitors or survive price cutting of its competitors.

By the Act of June 29, 1906, the Hepburn Act, 34 Stat. 584, Congress first acted to regulate interstate transportation of oil by pipe lines. The part of that Act here material, reads as follows: "Sec. 1. That the provisions of this Act shall apply to any corporation or any person or persons engaged in the transportation of oil or other commodity, except water and except natu-

---

4. The price f.o.b. Enid is normally based upon the Chicago Journal of Commerce "group 3" (Oklahoma) prices as shown in the issue of the Thursday preceding the date of shipment.

ral or artificial gas, by means of pipe lines, or partly by pipe lines and partly by railroad, or partly by pipe lines and partly by water, who shall be considered and held to be common carriers within the meaning and purpose of this Act, and to any common carrier or carriers engaged in the transportation of passengers or property wholly by railroad (or partly by railroad and partly by water when both are used under a common control, management, or arrangement for a continuous carriage or shipment), from one State or Territory of the United States, or the District of Columbia, * * *."

By the Act of February 28, 1920, 41 Stat. 456, 474, amending the Interstate Commerce Act § 1 of that Act was amended to read, in part, as follows:

"Sec. 400. * * *.

"(1) That the provisions of this Act shall apply to common carriers engaged in —* * *.

"(b) The transportation of oil or other commodity, except water and except natural or artificial gas, by pipe line, or partly by pipe line and partly by railroad or by water; * * *.

"(3) The term 'common carrier' as used in this Act shall include all pipe-line companies; telegraph, telephone, and cable companies operating by wire or wireless; express companies; sleeping car companies; and all persons, natural or artificial, engaged in such transportation or transmission as aforesaid as common carriers for hire."

By the enactment of the Communications Act of 1934, 48 Stat. 1064, 1102, the provisions of the Interstate Commerce Act, as amended, in so far as they related to communications by wire or wireless, or to telegraph, telephone or cable companies operating by wire or wireless, except certain provisions not here material, were repealed, so that the phrase, "telegraph, telephone, and cable companies operating by wire or wireless," was eliminated from the definition of common carrier in the Interstate Commerce Act.

The question presented is whether Champlin is so engaged in the transportation of petroleum products by pipe line within the meaning of § 1 of the Interstate Commerce Act, as amended by § 400 of the Transportation Act of 1920, that the Commission may require it to transport the petroleum products of others as a common carrier for hire. Admittedly, Champlin's operations fall within the literal language of such § 1, but to construe the statute literally would result in far-reaching consequences, and in our judgment would raise grave constitutional questions.

In the Pipe Line Cases (U. S. v. Ohio Oil Co.) 234 U.S. 548, 34 S.Ct. 956, 58 L. Ed. 1459, the facts were these: Standard Oil Company and its affiliates controlled the only practical means of oil transportation in the area lying between California and the Atlantic seaboard and carried much the greater part of the oil transported in such area. They made use of their monopoly of such means of transportation by refusing to carry oil through their pipe lines unless the producers of the oil would first sell their oil to them at prices dictated by Standard. They carried "everybody's oil," but imposed as a condition to the transportation that the oil be sold before it would be received into their pipe lines.[5] It was that situation which prompted Congress to enact that part of § 1 of the Hepburn Act, which dealt with the transportation of oil by pipe lines.[6]

The Supreme Court held that Standard and its affiliates were common carriers of oil in everything but form; that they were common carriers in substance because they purchased and carried all oil offered; that the amendment applied to them; that Congress, under the commerce clause, could require those who are common carriers in substance to become so in form, and that while it did not compel them to continue to carry oil, it required them not to continue

5. 234 U.S. 558, 559, 560, 561, 34 S.Ct. 956, 58 L.Ed. 1459.

6. Pipe Line Cases, (U. S. v. Ohio Oil Co.) 234 U.S. 548, 558–561, 34 S.Ct. 956, 58 L.Ed. 1459; Valvoline Oil Co. v. United States, 308 U.S. 141, 146, 60 S.Ct. 160, 84 L.Ed. 151; 40 Congressional Record 6361, 6365, 7000.

to carry oil except as common carriers.[7] In the same decision the Supreme Court held that the Uncle Sam Oil Company, although it operated a pipe line through which it transported its own oil, drawn from its own wells, across a state line to its refinery for processing at the refinery, was beyond the reach of the amendment because it was not engaged in the transportation of oil as a common carrier within the purview of the amendment.

And in Valvoline Oil Co. v. United States, 308 U.S. 141, 60 S.Ct. 160, 162, 84 L. Ed. 151, in distinguishing its operation from that of the Uncle Sam Oil Company, the court said: "But that company's (The Uncle Sam Oil Company) pipe line was used for the 'sole purpose of conducting oil from its own wells to its own refinery.' This was held not to be transportation under the Act. Here, however, it is the purchase from many sources and subsequent carriage that determine the applicability of the statute to Valvoline."

In the Valvoline case the interpretation of the Hepburn Act of 1906 in the Pipe Line Cases was held to have been carried into the Act, as amended in 1920, despite certain changes in language.

If Champlin, in response to the Commission's order, should publish and file tariff schedules showing its rates and charges for interstate transportation of refined petroleum products between different points on its pipe line, that would constitute an implied invitation to the public to tender petroleum products for transportation by Champlin's pipe line and would convert it from a carrier solely of its own products into a common carrier of products of others, for hire.

The question whether Congress, acting through the Commission, may thus convert a private pipe line into a public utility and require a private carrier to become a public carrier without violating the due process clause of the Fifth Amendment was not involved in Champlin Refining Co. v. United States, 329 U.S. 29, 67 S.Ct. 1, 3, 91 L.Ed. 22. The court there said: "Appellant further contends that, as so construed, the Act exceeds the commerce power of Congress and violates the due process clause of the Fifth Amendment because it is argued that this interpretation converts a private pipe line into a public utility and requires a private carrier to become a common carrier. But our conclusion rests on no such basis and affords no such implication. The power of Congress to regulate interstate commerce is not dependent on the technical common carrier status but is quite as extensive over a private carrier. This power has yet been invoked only to the extent of requiring Champlin to furnish certain information as to facilities being used in interstate marketing of its products. The commerce power is adequate to support this requirement whether appellant be considered a private carrier or a common carrier."

And in Valvoline Oil Co. v. United States, 308 U.S. 141, 146, 60 S.Ct. 160, 162, 84 L.Ed. 151, the court said: "Appellant presses its argument beyond the question whether it comes under the Act. If it does, it urges, the Act is in violation of the due process clause in that by the involuntary change of status from private to common carrier its property is taken. It looks upon the various regulatory provisions of the Interstate Commerce Act as inseparable from the valuation provisions of Section 19a(a) and (e). The losses feared, from present or future legislation other than the valuation provisions, may never occur. The data required by the present order may never be used to fix rates. No such information as to other pipe lines has been so used. Publicity alone may give effective remedy to abuses, if any there be. This legislation was intended to free interstate commerce in oil from practices believed to be detrimental, and in that connection accessibility of valuation information to the Congress is essential. Its separate significance being apparent, we confine ourselves to Section 19a(a) and (e)."

In the prior action the question involved was whether the Commission could require Champlin to furnish certain information under § 19a of the Interstate Commerce

7. 234 U.S. 560, 561, 34 S.Ct. 956, 58 L. Ed. 1459.

Act, which the Supreme Court held could be required of a private carrier. Compliance with the order here involved would convert Champlin into a common carrier for hire. The power to regulate a private carrier in interstate commerce is one thing, but the power to compel a private carrier either to cease its operations as such, or to become a common carrier and to carry the goods of others for hire is quite a different thing.

█ We are of the opinion that Congress did not intend § 1 of the Hepburn Act and § 400 of the Transportation Act of 1920 to subject carriers of oil by pipe line, who carry only their own products and who are not, at least, common carriers in substance, to regulations requiring them to transport the products of others as common carriers for hire. Here, Champlin transports its own petroleum products through its pipe line to storage tanks at the three terminal points. It has never transported products belonging to any other person, firm or corporation. It markets its products only after they have come to rest in such storage tanks, and in certain instances after additional processing. It retains title to such products until the sale thereof from its bulk storage tanks at one of the terminals. It has never made a sale on condition that the product sold would be shipped by means of its pipe line. Of course, the products have a greater sale value at the terminal points than they would have f.o.b. the refinery, because if the purchaser bought at the refinery he would have to incur the cost of transportation to his place of business and deliveries can be made to the purchaser with greater expedition and convenience from the terminal points. Naturally, the cost of transportation to some extent is reflected in the selling prices at the terminal points, but the selling prices at such points are not the Enid f.o.b. price, plus the cost of transportation. They are determined by the prices in a competitive market and are prices that enable Champlin to sell its products in competition with other marketers of petroleum products. Champlin is not a common carrier, either in fact or in substance.[8]

In the Pipe Line Cases, Standard and its affiliates enjoyed a monopoly and compelled, as a condition of transportation, other producers of oil to sell to them at their prices, but they carried everybody's oil. Here, Champlin enjoys no monopoly, transports its own products, and after they have come to rest in storage tanks at terminal points, sells them, not at prices dictated by it, but at prices compelled by competition in the market. It supplies a very small percentage of the gasoline consumed in the area. Its acts create competition and do not enable it to foster or enjoy a monopoly.

█ We conclude that Champlin is not in substance a common carrier of petroleum products and may not be required to construct receiving facilities and delivery facilities and carry the petroleum products of others as a common carrier for hire, or cease operation of its pipe line, and that to hold otherwise would be to take its property without due process of law, in violation of the Fifth Amendment.[9]

MURRAH, Circuit Judge (dissenting).

In the former case, 59 F.Supp. 978, 981, we held the identical operations of this plaintiff within the jurisdiction of the Interstate Commerce Commission as a statutory common carrier "engaged in * * * the transportation of oil * * * by pipe line" under Section 1 of the Interstate Commerce Act, as amended. We accordingly sustained the jurisdiction of the Commission to require the plaintiff to furnish valuation reports under Section 19a of the Act.

Our decision was affirmed in Champlin Refining Co. v. United States, 329 U.S. 29, 67 S.Ct. 1, 3, 91 L.Ed. 22, the Court spe-

8. Cf. Pennsylvania Railroad Co. v. Public Utilities Commission of Ohio, 298 U.S. 170, 56 S.Ct. 687, 80 L.Ed. 1130; Pennsylvania R. Co. v. Pittsburgh, L. & W. R. Co., 6 Cir., 83 F.2d 861.

9. Producers Transportation Company v. Railroad Commission of the State of California, 251 U.S. 228, 230, 231, 40 S.Ct. 131, 64 L.Ed. 239.

cifically holding that "Champlin's operation is transportation within the meaning of the Act and that the statute supports the Commission's order to furnish information.

There is no actual difference in this case and the former, and in my judgment, it should be affirmed on the authority of that case.

If the Commission is authorized to require Champlin to comply with the provisions of Section 19a of the Act as a common carrier subject to the Act, I can see no justifiable basis for denying jurisdiction to require compliance with Section 20 and 6 of the same Act. In either case, jurisdiction of the Commission over Champlin as a common carrier, subject to the provisions of the Act, is an indispensable prerequisite to the exercise of its asserted authority. If it has jurisdiction under one Section of the Act, it assuredly has jurisdiction under the other.

The only suggested distinction between this case and the former is that Champlin has now abandoned the price deferentials between F.O.B. refinery and the terminal points. The deferentials in the former case were intended to reflect the railroad transportation charges between the refinery and the terminals. But in any event, the prices F.O.B. refinery fluctuated to meet competitive prices at the terminal. Now Champlin has adopted the more realistic method of posting prices at each terminal, with allowances to meet the competitive market price. The result is no different—in each case the transportation cost is an indispensable factor in the price structure.

There is nothing in the order of the Commission which has the effect of requiring Champlin to convert its private pipe line into a common carrier in fact. Certainly there is nothing in the order requiring Champlin to provide new inlets or outlets, or for that matter, to make any structural or operational changes in its system whatsoever.

Although the importance of this Regulation of the Interstate Commerce Commission may not be manifest on the facts of this record, the asserted authority of the Commission undoubtedly bears a permissi-

ble relationship to interstate transportation of oil commodities from point of production to points of consumption.

I would sustain the jurisdiction of the Commission and dismiss the action.